# EXHIBIT D

**IN SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| LADONNA MAY<br>1262 Talbert Street SE Unit 5A<br>Washington, DC  20020 | )<br>)<br>)<br>) |
| ADE ADENARIWO<br>1262 Talbert Street SE Unit 9A<br>Washington, DC  20020 | )<br>)<br>)<br>) |
| BRITNEY BENNETT<br>1262 Talbert Street SE Unit 5B<br>Washington, DC  20020 | )<br>)<br>) |
| THERESA BROOKS<br>1262 Talbert Street SE Unit 20A<br>Washington, DC  20020 | )<br>)<br>) |
| DAVINA CALLAHAN<br>1262 Talbert Street SE Unit 14A<br>Washington, DC  20020 | )<br>)<br>) |
| DENINE EDMONDS<br>1262 Talbert Street SE Unit 10B<br>Washington, DC  20020 | )<br>)<br>) |
| CIERA JOHNSON<br>1262 Talbert Street SE Unit 7B<br>Washington, DC  20020 | )<br>)<br>) |
| ROBIN MCKINNEY<br>1262 Talbert Street SE  Unit 15A<br>Washington, DC  20020 | )<br>)<br>) |

2021 CA 000266 B
(CONSOLIDATED WITH
2021 CA 002268 B)

**PLAINTIFFS' SECOND**
**AMENDED COMPLAINT**

Judge Yvonne Williams

Status Conference: 4/21/2023

                    *Plaintiffs*,
          v.

STANTON VIEW DEV., LLC,
          *Serve: 1054 31st St, N.W.*
                    *Washington DC 20007*
                    -and-
                    *LPRA INC*
                    *4725 Wisconsin Avenue, N.W.*

*Suite 250* )
*Washington, D.C. 20016* )
)
RIVEREAST AT ANACOSTIA, LLC, )
   *Serve: 1054 31st St, N.W.* )
      *Washington DC 20007* )
      *-and-* )
      *Tamara Lee* )
      *1054 31st Street* )
      *Suite 290* )
      *Washington, D.C. 20007* )
)
RIVER EAST AT GRANDVIEW )
CONDOMINIUM UNIT OWNERS' )
ASSOCIATION, INC., )
   *Serve: District Registered Agent* )
      *Services Inc.* )
      *1025 Connecticut Ave NW* )
      *Suite 615* )
      *Washington, D.C. 20036* )
)
DISTRICT OF COLUMBIA, acting through )
the D.C. DEPARTMENT OF HOUSING )
AND COMMUNITY DEVELOPMENT, )
   *Serve: Ms. Julia Wiley* )
      *Office of General Counsel* )
      *1800 Martin Luther King Jr.* )
      *Avenue. SE* )
      *Washington, DC 20020* )
      *-and-* )
      *Office of the Attorney* )
      *General* )
      *400 6th Street, NW,* )
      *Washington, DC 20001* )
)
JERRY VINES )
   *12138 Central Avenue* )
   *Suite 921* )
   *Mitchellville, MD 20721* )
)
   *4510 Lord Landing Rd* )
   *Upper Marlboro MD 20772* )
)
DONTE LEE )
   *14401 Turner Wootton Pkwy* )
   *Upper Marlboro, MD 20774* )

      *14314 Turner Wootton Pkwy* )
*Upper Marlboro MD 20774* )

ANDREW BATTLE )
     *11800 Lilium Lane* )
     *Glenn Dale, MD 20769* )

SGA COMPANIES, INC., )
     *Serve: SGA Companies, Inc.* )
     *7508 Wisconsin Avenue, 4th Fl.* )
     *Bethesda, Maryland 20814* )

MADDOX ENGINEERS AND )
SURVEYORS, INC., )
     *Serve: LSBA, Inc.* )
     *c/o Miles & Stockbridge P.C.* )
     *100 Light Street* )
     *Baltimore, MD 21202* )

SKARDA AND ASSOCIATES, INC., )
     *Serve: Registered Agent Solutions, Inc.* )
     *1100 H Street, NW, Suite 840* )
     *Washington, D.C. 20005* )

CAPITOL DEVELOPMENT DESIGN, INC. )
     *Serve: James Watkins, Registered Agent* )
     *1002 Shepherd St., NE* )
     *Washington, D.C. 20017* )

FES GROUP, LLC, )
     *Serve: Corporation Service Company* )
     *1090 Vermont Ave., NW* )
     *Washington, D.C. 20005* )

M&F CONCRETE, INC., )
     *Serve: Marcos Silva, Registered Agent* )
     *12082 Serenity Pl.* )
     *Nokesville, VA 20181* )

         *Defendants.* )
_____ )

## PLAINTIFFS' SECOND AMENDED COMPLAINT[1]

Plaintiffs LaDonna May, Ade Adenariwo, Britney Bennett, Theresa Brooks, Davina Callahan, Denine Edmonds, Ciera Johnson, and  Robin McKinney, (collectively hereinafter "Plaintiffs"),[2] by and through the undersigned counsel, hereby bring this action for damages and all other available relief against Defendants Stanton View Development, LLC, Rivereast, LLC, River East and Grandview Condominium Units Association, Inc., District of Columbia acting through the DC Department of Housing and Community Development, SGA Companies, Maddox Engineers and Surveyors, Inc., Skarda and Associates, Inc., Capitol Development Design, Inc., FES Group, LLC and M&F Concrete, Inc., (collectively hereinafter "Defendants") for the specific causes of action listed below as set forth by each Plaintiff and against enumerated Defendants, including violations of the Consumer Protection Procedures Act and the DC Human Rights Act; breach of warranty against structural defects; false or misleading statement in a public offering statement; negligent construction; breach of contract; breach of implied warranties; negligent misrepresentation; negligence; fraud; strict liability; and intentional infliction of emotional distress. On information, knowledge, and belief, Plaintiffs allege as follows:

## JURISDICTION

1.      Jurisdiction of this Court over Defendants is invoked pursuant to D.C. Code § 11-921(a)(6).

---

[1] A redline of this Second Amended Complaint against the First Amended Complaint filed on November 2, 2022, is attached hereto.
[2] Counsels' Motion to Withdraw for Plaintiffs Britney Bennett and Davina Callahan was filed on January 3, 2023. This matter is pending before this Court. Plaintiff Bennett's and Callahan's name and information are included in this Second Amended Complaint for purposes of completeness, pending this Court's ruling on counsel's motion to withdraw.

2.      The Court has personal jurisdiction over Defendants under §§ 13-422 and/or 13-423. The condominiums at issue are all located in the District of Columbia, and the acts and omissions described herein occurred in the District of Columbia.

## **PARTIES**

3.      Plaintiff LaDonna May is an adult Black female, first-time home buyer, resident of Washington, DC, and resides at 1262 Talbert Street, SE ("Talbert Street" or "the Property") Unit #5A, Washington DC 20020.

4.      Plaintiff Ade Adenariwo is an adult Black female, first-time home buyer, resident of Washington, DC, and resides at 1262 Talbert Street, SE Unit #9A, Washington DC 20020.

5.      Plaintiff Britney Bennett is an adult Black female, first-time home buyer, resident of Washington, DC. and resides at 1262 Talbert Street, SE Unit #5B, Washington DC 20020.

6.      Plaintiff Theresa Brooks is an adult Black female, first-time home buyer, resident of Washington, DC, and resides at 1262 Talbert Street, SE Unit #20A, Washington DC 20020.

7.      Plaintiff Davina Callahan is an adult Black female, first-time home buyer, resident of Washington, DC, and resides at 1262 Talbert Street, SE Unit #14A, Washington DC 20020.

8.      Plaintiff Denine Edmonds is an adult Black female, first-time home buyer, resident of Washington, DC, and resides at 1262 Talbert Street, SE Unit #10B, Washington DC 20020.

9.      Plaintiff Ciera Johnson is an adult Black female, first-time home buyer, resident of Washington, DC, and resides at 1262 Talbert Street, SE Unit #7B, Washington DC 20020.

10.     Plaintiff Robin McKinney is an adult Black female, first-time home buyer, resident of Washington, DC, and resides at 1262 Talbert Street, SE Unit #15A, Washington DC 20020.

11.     On information and belief, at all relevant times herein mentioned, Defendant Stanton View Development, LLC ("Stanton") is a Washington, DC business operating as a Limited Liability Company with its principal place of business in the District of Columbia, with its headquarters located at 3119 Martin Luther King, Jr. Ave. S.E., 2nd Floor, Washington DC 20032 and/or 1054 31st Street NW, Suite 290, Washington, DC 20007, and whose registered agent is LPRA, Inc. 4725 Wisconsin Ave. N.W. Suite 250, Washington D.C. 20016.

12.     On information and belief, at all relevant times herein mentioned, Defendant Rivereast at Anacostia, LLC ("Rivereast") is a Washington, DC business operating as a Limited Liability Company with its principal place of business in the District of Columbia, with its headquarters as c/o Stanton Development LLC 1054 31st St. N.W. Suite 290, Washington, DC 20007, and whose registered agent is 1054 31st Street, Suite 290, Washington, D.C. 20007.

13.     On information and belief, Stanton and Rivereast are owned and/or operated by the same individuals, Jerry Vines and Donte Lee, and may have been created to improperly limit and protect their liability. According to filings of record with District of Columbia Consumer and Regulatory Affairs number L00004868797 the executing officer of

Rivereast at Anacostia LLC is Stanton View Development. Accordingly, whenever Stanton is referenced throughout this Complaint, Rivereast is also included as a potential responsible party for the factual allegations; and vice versa.

14.     On information and belief, at all relevant times herein mentioned, River East at Grandview Condominium Unit Owners' Association, Inc. ("REGCUOA") is a Washington, DC business operating as a non-profit corporation with its principal place of business in the District of Columbia, with its headquarters at c/o Quality 1 Property Management, LLC, 12138 Central Avenue, Suite 863, Mitchellville, MD 20721, and whose registered agent is District Registered Agent Services, Inc. 1025 Connecticut Ave., N.W. Suite 615, Washington, D.C. 20036.

15.     Defendant District of Columbia, acting through the D.C. Department of Housing and Community Development, Housing Regulation Administration, Rental Conversion and Sale Division ("the District" or "DCDHCD") is an independent arm of the District government. Its mission is to create and preserve opportunities for affordable housing and economic development and to revitalize underserved communities in the District of Columbia.[3] DCDHCD provided Defendants Stanton and/or Rivereast $6,310,788.00 from the DC Housing Production Trust Fund (HPTF) by the DC Council, CA20-0384, to develop River East at Grandview Condominiums ("REGC" or "subject properties")—the properties at issue in this lawsuit.

16.     Upon information and belief, SGA Companies, Inc. ("SGA") was a corporation organized in the State of Maryland and formerly registered as a foreign

---

[3] See https://dhcd.dc.gov/page/mission-and-vision-DHCD

corporation in Washington D.C., with its principal place of business located at 7508 Wisconsin Avenue, 4th Floor, Bethesda, Maryland 20814.

17.      Upon information and belief, Maddox Engineers and Surveyors, Inc. ("Maddox") is a corporation organized in the State of Maryland, with its principal place of business located at 100 Park Avenue, Rockville, Maryland 20850.

18.      Upon information and belief, Skarda and Associates, Inc. ("Skarda") is a corporation organized in the State of Maryland and registered as a foreign corporation in Washington D.C., with its principal place of business located at 2439 North Charles Street, Baltimore, Maryland 21218.

19.      Upon information and belief, Capitol Development Design, Inc. ("CDDI") is a corporation organized in the state of Maryland and registered as a foreign corporation in Washington D.C., with its principal place of business located at 4600 Powder Mill Rd., Suite 200, Beltsville, Maryland 20705.

20.      Upon information and belief, M&F Concrete, Inc. ("M&F") is a corporation organized in the Commonwealth of Virginia with its principal place of business located at 9515 Contractor's Court, Suite 100, Manassas, Virginia 20109.

21.      Upon information and belief, FES Group, LLC ("FES") is a limited liability company, organized in the State of Maryland and previously registered as a foreign company in Washington D.C., with its principal place of business located at 8296 Sherwick Court, Jessup, Maryland 20794.

## FACTS

22.      Defendants Stanton and Rivereast received over six (6) million dollars of government funding to construct new condominiums in Southeast D.C.

23.        Each Plaintiff was a first-time homebuyer with low- to moderate-income. Each was excited for the opportunity to own their own home.

24.        Each Plaintiff, within days or weeks of moving into their brand new home, realized that there were substantial issues related to the units. They were all repeatedly told by Defendants Stanton and/or Rivereast that the issues were the result of normal and standard settling and to wait until the end of their one-year warranty period for the repairs to be completed.

25.        Each Plaintiff continues to suffer from severe and exacerbated structural and foundational defects that existed at the time of purchase and were never adequately corrected or repaired.

**LaDonna May**

26.        On or about July 21, 2017, LaDonna May ("May") purchased 1262 Talbert Street, SE, Unit #5A, Washington, DC 20020 (the "May Property") from Defendants Stanton and/or Rivereast.

27.        May purchased the property under the DC Home Purchase Assistance Program ("HPAP") administered under DC's Housing Production Trust Fund.

28.        The HPAP program provides interest-free loans and closing cost assistance to qualified applicants to purchase single family houses, condominiums, or cooperative units in the District. To be eligible for the HPAP, the applicant must be head of the household and first-time home buyer; very low to moderate income; purchased home must be borrower's primary residence and must be located within the District of Columbia; and possess a good credit rating.

29.      May is a Black female DC resident and the condominium unit is located in Ward 8, which has a 92% Black population.

30.      Prior to purchasing the May Property, Rivereast orally represented that every "A" unit could access their rooftop for residential uses. In fact, the purchase price for the May unit was priced higher because of the rooftop access capability. May could not and has not had access to the rooftop for residential uses since purchase.

31.      Within two months of moving into the May property, in early September of 2017, May observed large wall and ceiling openings, windows no longer closing

 

completely and separation of bathtub and floor throughout the unit. These openings were not standard hairline cracks. The following photos were captured on or around September of 2017.

32.      As the photographs above depict, the walls were separating from each other and were substantially more than hairline cracks, typical of standard settlement.

33.      In September 2017, May notified Stanton of the damage and requested that repairs be made, and in response, Stanton dispatched a representative, Randy Harris and Kevin Galloway, to inspect the damage. Stanton's representative characterized the damage initially as typical new construction settlement-cracks and applied a flexi-corner drywall product to repair the damage.

34.      Within a few days of the repair, toward the end of September 2017, May notified Stanton of new openings that appeared, as well as reopening of the openings previously "repaired" in early September 2017. After being notified, Mike Deguzman and Kimmel Daniels from Stanton performed a walk-thru with May and said they would dispatch another representative who again attempted to repair the reopened and new openings with flexi-corner drywall. The following photos were captured on December 7, 2017.

 

35.      Between October and November 2017, May notified Stanton of issues with her floors being uneven and separating.  In September 2017 May watched Stanton perform work to the foundation of the  unit (5B) underneath  her. She was told by an employee

working for the company Stanton hired to perform the work that because they failed to place rebars down they had to remove the foundation and place pre-stressed rebar in the ground unit below the May Property—Unit #5B (which eventually was purchased by Plaintiff Britney Bennett).

36.     Again, in December of 2017, May notified Stanton of the openings that reopened once again, as well as new additional openings in her unit.

37.     Stanton dispatched a representative to May's unit who then cut and replaced an entire wall in her living room in attempt to repair the recurring openings. Stanton informed May that the replacement of the wall would require 2-3 weeks with an estimated completion date of January 1, 2018.  May remained in the unit while Defendant Stanton performed the work.  Within a week after the wall repair was complete, the gaps reopened and Stanton never addressed the issues with uneven flooring.

38.     In February of 2018, Stanton entered May's unit to make several additional unsuccessful attempts to repair the recurring opening issues.

39.     On April 24, 2018, Stanton entered into an oral agreement with May for her to vacate the May Property to allow Stanton to enter the unit to perform substantial repairs. In exchange, Stanton agreed to reimburse May for temporary relocation expenses. Defendant Staont verbally informed May that the repairs would take ten (10) days to complete.

40.     On April 24, 2018, May vacated her unit.

41.     On April 25, 2018, May hired Soil Consulting Engineering (SCE) for $900.00 to perform an independent third party inspection on the unit. The inspection identified likely structural defects that were causing the walls and floors to become separated and

required additional time to assess for continued movement or damage of the May Property. The report found evidence that the foundation of the building or a portion thereof, is settling.  SCE was not provided a site plan for the Property, approved building plans or any geotechnical or soil report for the Property and could therefore make no additional findings. The recommendation was to have a full-scale geotechnical foundation assessment of the building foundation and the retaining wall and to continue to monitor cracks in the unit.

42.     Stanton failed to complete repairs within the agreed upon ten (10) days, and on May 4, 2018, May hired Soil Consulting Engineering (SCE) for $3,500.00 to assess her unit and given the extensive and ongoing issues in her unit, SCE created an interior movement monitoring and observation report. May could not afford to pay for the additional assessments.

43.     On May 18, 2018, Stanton provided May with an updated schedule of the work that would be performed.  Stanton also agreed to move May's furniture from her unit to a storage unit that she had leased to avoid any damage to furniture and other personal effects.

44.     On June 29, 2018, Stanton notified May that they had completed the repairs. Due to May being on bedrest as a result of her pregnancy, May sent her representative, Jamall Hardaway, to her unit to update her on the work being performed. On all of the visits, Hardaway confirmed that May's furniture was never moved out of her unit or properly cared for to ensure it would not be damaged.  May's furniture was damaged during the repairs. On one visit, the refrigerator was unplugged and all food was spoiled and had to be thrown away.

45.     During 2018, May was pregnant. In large part because of the stress and anxiety caused by nearly daily issues related to her unit's construction defects, May went into

premature labor. Her daughter was born on July 11, 2018, at 27weeks premature. May was on complete bed rest for almost the entire pregnancy. May was hospitalized prior to and after the delivery of her baby. The baby was released from the hospital on September 7, 2018.

46.     Upon return to her unit, she continued to have problems with the unit, which only exacerbated and complicated her post-delivery recovery, in addition to caretaking her fragile and vulnerable newborn.

47.     Currently, even over three years later, the unit remains with even larger gaping 2-3" openings in the walls and uneven and warped floors that were never addressed, as depicted in the photographs below.



48.     Exasperated by the ongoing daily struggles and defective housing, May submitted the warranty claims to the DCDHCD on or about March 31, 2019.

49.     After May's submission, May learned that neither Stanton nor Rivereast had posted the requisite warranty security to ensure against structural defects, as required by D.C. Code §42-1903.16.

50.     Although the REGC property was funded by the DCHCD HPTF with over $6,000,000.00 dollars, DCHCD did not ensure compliance with D.C. requirements and obligations of its grantees.

51.     After the warranty security issue was raised with both DCHCD and Stanton, Stanton and/or Rivereast posted a surety bond valued at $436,937.71 on August 22, 2019, over two years *after* the construction or renovations were completed.

52.     Upon information and belief REGCUOA submitted its warranty claims on or about July 5, 2019, two months after May's submission.

53.     REGCUOA, in a letter to the DCDHCD, Rental Conversion and Sale Administrator, stated that Stanton "continues to hinder [REGCUOA's] ability to finish filing the structural warranty claim." Stanton has prevented REGCUOA from having a structural engineer inspect and assess foundational issues.

54.     May reached out to District of Columbia Office of Regulatory Affairs ("DCRA") to get assistance in dealing with her housing and consumer problems, particularly because it was a DC HPTF property.

55.     On October 9, 2019 DCRA came to the May unit for inspection.

56.     The inspector stated the May that if her unit was a rental unit, she would cite the landlord/owner for an uninhabitable property and would require the tenant to relocate immediately.

57.     Instead of assisting May with her repeated issues with the property and responsible Defendants, DCRA cited May with the following DC Official Code and/or DC Municipal Regulation Citations:

    a.   IPMC §304.1.1 Permitting an unsafe exterior structural condition to exist on a premises wherein foundation systems that are not firmly supported by footings are not plumb and free from open cracks and breaks, are not properly anchored, or are not capable of supporting all nominal loads and resisting all load effects. Fine $1,037.00 Required abatement within 7 days.

    b.   IPMC §304.5 Failure to maintain foundation wall free from open cracks or breaks. Fine $519.99 Required abatement within 7 days.

    c.   12-G DCMR §304.7 Failure to maintain roof drains, gutters and downspouts in good repair or free from obstructions.  Fine $519.99 Required abatement within 7 days.

58.     May was unable to have the issues abated and unable to afford the fines.

59.     May was found in default of the infractions and required to pay $6,225, based on a final DCRA Order on September 14, 2020.

60.     May appealed the decision and the DCRA Office of Administrative Hearings ordered the parties to resolve their dispute or appear at a hearing on Monday January 25, 2021 at 2:30 pm.

61.     On January 19, 2021, nearly 9 months after May was cited and fined for housing code violations, the DCRA moved to vacate the September 14, 2020, Final Order and moved for voluntary dismissal with prejudice. At the time of this Complaint, the Motion has not been ruled upon by the DCRA Administrative Court.

62.     In July 2020, May again sought the assistance of another DC government agency--the Office of the Attorney General for the District of Columbia ("OAG"). Among other things, Chief Deputy Attorney General Jason Downs informed Plaintiff May's representatives that May's unit "raises serious health and safety concerns beyond what any other resident is facing. …We encourage you to consider a private lawsuit under the CPPA."

63.     To date, Defendants Stanton and/or Rivereast have failed to adequately respond to the warranty claims initially submitted by May in March 2019.

64.     The District of Columbia government, instead of assisting May with the property that it funded through taxpayer dollars and the HPTF, has issued violations and fines against May for the very structural and foundational issues that she had been seeking relief and assistance from the first day that she entered the property on a DC funded property, including requiring her to seek legal assistance and appeals for relief and assistance.

65.     On information and belief, May's property defects are the result of foundational and structural property defects.

**Ade Adenariwo**

66.      On or about August 09, 2017, Ade Adenariwo ("Adenariwo") purchased 1262 Talbert Street, SE, Unit #9A, Washington, DC 20020 (the "Adenariwo Property") from Defendants Stanton and/or Rivereast.

67.      Adenariwo purchased the property with the assistance of the DC HPAP program.

68.      Adenariwo is a Black female resident and the condominium unit is located in Ward 8, which has a 92% Black population.

69.      Prior to purchasing the Adenariwo Property, Rivereast orally represented that every "A" unit could access their rooftop for residential uses. In fact, the purchase price for the Adenariwo unit was priced higher because of the rooftop access capability. Adenariwo could not and has not had access to the rooftop for residential uses since purchase.

70.      On or around August 9, 2017, Adenariwo discovered several interior gaps and openings on the walls throughout the Adenariwo Property. These cracks were not standard hairline cracks. Adenariwo immediately reported the issue to Stanton.

71.      Within 30 days, Stanton inspected the damage. Stanton applied a flexi-corner drywall product to repair the damage.

72.      On or around October 3, 2017, the gaps reported in August 2017 reopened, as well as new openings throughout the walls of the Adenariwo Property. Adenariwo immediately reported the reopenings and new openings to Stanton.

73.      Soon after Adenariwo's October 2017 report, Stanton inspected the damage. Stanton applied a flexi-corner drywall product to repair the damage.

74.     Despite Stanton's second attempt to repair the original gaps, new openings continued to appear along every floor and wall within the Adenariwo Property. Adenariwo reported the opening issues several more times to Stanton.

75.     Beyond Adenariwo's October 2017 report, Stanton failed to inspect and repair the reoccurring gaps despite Adenariwo's continued reports.

76.     To date, the openings have worsened exponentially as the gaps have widened and lengthened. The following photos were taken on January 2, 2020.

 

77.     On or around August 9, 2017, Adenariwo noticed the flooring from the living room to the dining room slanted significantly. Adenariwo reported the issue to Stanton immediately.

78.     In early 2018, Stanton inspected the slanting issue. Stanton attempted to repair the slanting issue, but the repair did not last.

79.     To date, the slanting issue has worsened.

80.      On or around August 9, 2017, Adenariwo began to experience congestion and sneezing while inside the Adenariwo Property. Prior to moving into the Adenariwo Property, Adenariwo rarely experienced these symptoms.

81.      Adenariwo suspects that mold is present in the Adenariwo property. Adenariwo fears that the potential mold is affecting her newborn child, Zanna Jones, who also experiences congestion while in the Adenariwo Property.

82.      On or around March 4, 2018, Adenariwo noticed a dripping sound above her kitchen and a leaking pipe below the kitchen sink. Adenariwo reported the issues immediately to Stanton.

83.      Within 30 days of Adenariwo's report, Stanton inspected the damages. Stanton repaired the leaking pipe below the sink. Stanton removed the drywall above her kitchen where Adenariwo heard the dripping sound. Stanton patched the removed drywall above her kitchen.

84.      Despite the repairs, Adenariwo continued to hear a dripping sound above her kitchen. Adenariwo reported the issue to Stanton again.

85.      Stanton failed to remedy the dripping sound and, instead, attempted to convince Adenariwo that the sound was normal.

86.      Adenariwo continued to hear the dripping sound for months after reporting the issue to Stanton.

87.      To date, Adenariwo no longer hears the dripping sound above her kitchen but is unaware of the extent of any mold or mildew issues that remain in her walls, ceiling and floor, as no mold remediation was completed.

88.        On or around March 30, 2018, Adenariwo noticed uneven areas of her rooftop where water pools. Adenariwo reported the issue to Stanton immediately.

89.        Stanton failed to address the uneven areas on Adenariwo's rooftop.

90.        To date, the uneven areas on Adenariwo's rooftop continue to collect rainwater, which results in mold.

91.        During 2020, Adenariwo noticed a sewage odor throughout the Adenariwo Property. Given Defendants' ongoing unresponsiveness, the issue was not reported to Stanton.

92.        To date, the sewage odor has worsened.

93.        On information and belief, Adenariwo's property defects and issues are the result of foundational and structural property defects.

**Britney Bennett**

94.        On or about January 31, 2019, Britney Bennett ("Bennett") purchased 1262 Talbert Street, SE, Unit #5B, Washington, DC 20020 (the "Bennett Property") from Defendants Stanton and/or Rivereast.

95.        Bennett purchased the property under the DC HPAP program.

96.        Bennett is a Black female resident and the condominium unit is located in Ward 8, which has a 92% Black population.

97.        From before and during the time of purchase, the Bennett Property's foundation had large cracks in the cement floor. These foundational cracks were covered with carpet at the time of purchase and were not disclosed to Bennett by any Defendant.

98.     At no time did Defendants Stanton or Rivereast inform Bennett that her foundation had large cracks in the cement floor or that previous foundational repairs were made to or below her unit.

99.     Within three weeks of moving into her unit, Bennett noticed large cracks and openings in the walls throughout the Bennett Property. Bennett reported the cracks to Stanton immediately.

100.    Stanton characterized the damage as typical new construction settlement-cracks. Stanton explained that they would fix the damage after she had lived in the Bennett Property for a year.

101.    On December 1, 2019, Stanton applied a flexi-corner drywall product to repair the wall damage.

102.    Within a month or two, the gaps and openings reappeared in the same locations that were repaired in December 2019, as well as new locations.

103.    To date, the openings in the walls throughout the Bennett Property are still present and have lengthened and widened.

104.    About three months after Bennett moved into the Bennett Property, she lifted up the carpet and found a large crack in the cement. The crack appeared to have previously been covered by a lighter gray putty or material.

105.    Upon information and belief, Stanton was aware of the foundational cracks in the cement back in 2017, prior to Bennett's purchase, and attempted to cover it up.

106.    Stanton made no attempt to fix the large crack in the cement.

107.     To date, the cement crack has become so large that Bennett can clearly see the outline of the crack despite the carpet covering it. The following photos were captured on January 12, 2021.

 

108.     In or around June 2019, Bennett experienced a leak under the sink in the upstairs guest bedroom upstairs causing water damage to the wooden cabinet located under the sink. Bennett reported the leak to Stanton immediately.

109.     In October of 2019, Bennett experienced leaks under the two sinks in her master bathroom causing water damage to the wooden cabinet located under the sink and the carpet in Bennett's master bedroom. Bennett reported the leak to Stanton immediately. The following photos were captured on November 22, 2019.

 

110.    On December 1, 2019, Stanton repaired all three sinks and replaced the wooden cabinets under the sinks.

111.    At no point did Stanton attempt to repair the water damage to the carpets in Bennett's master bedroom.

112.    One day after Stanton's repair, one of the sinks in the Bennett's master bathroom began leaking again, causing water damage to the new wooden cabinet under the sink.

113.    The master bedroom started leaking again the next day.

114.    To date, Bennett does not have access to one of her master bathroom sinks and the wooden cabinet under the sink suffers from water damage.

115.    In November of 2019, Bennett noticed that the window in the upstairs living room cannot close completely. Bennett reported the issue to Stanton immediately.

116.    Stanton never attempted to fix the window.

117.     To date, the window cannot close which allows air and insects to enter the Bennett Property.

118.     In November of 2019, Bennett noticed that a gap had formed around the edges of the entire front door.

119.     In December of 2019, Stanton repaired the front door.

120.     Within two months of the repair, the gap began to appear again.

121.     To date, the gap around the front door has enlarged to the point where an intruder could easily enter the Bennet Property by wedging a credit card between the door frame and the latch bolt.

122.     In November 2020, Bennett discovered mold in the upstairs bedroom.

123.     Bennett has not reported the mold to Stanton because of Stanton's unresponsiveness and Stanton has made it clear that it will no longer repair issues in the Bennett Property as the one year warranty has passed.

124.     To date, Bennett struggles with mold in the upstairs bedroom.

125.     On information and belief, Bennett's property defects and issues are the result of foundational and structural property defects.

**Theresa Brooks**

126.     On or around December 23, 2017, Theresa Brooks ("Brooks") purchased 1262 Talbert Street, SE, Unit #20A, Washington, DC 20020 (the "Brooks Property") from Defendants Stanton and/or Rivereast.

127.     Brooks purchased the property under the DC HPAP program.

128.     Brooks is a Black female resident and the condominium unit is located in Ward 8, which has a 92% Black population.

129.     Prior to purchasing the Brooks Property, Rivereast orally represented that every A unit could access their rooftop for residential uses. In fact, the purchase price for the Brooks unit was priced higher because of the rooftop access capability. Brooks could not and has not had access to the rooftop for residential uses since purchase.

130.     Prior to purchasing the Brooks Property, Rivereast also orally represented that the Property had 3 bedrooms, but one of the "bedrooms" does not have a closet and, is therefore, not a bedroom.

131.     After she moved into her unit, Brooks noticed that the top step leading to her interior front door was pulling away from the interior front door, exposing a significant gap. Brooks can feel and hear it physically moving. The wood and structure below her door appear to be unstable and rotted. Brooks reported the issue to Stanton immediately.

132.     To date, there is still a significant gap, approximately 1 ½ feet high from the top step leading to her interior front door, as reflected in the following photographs from July 2019

133.     Stanton failed to inspect or repair this issue.

 

134.      Upon moving in, around January 2018, Brooks' noticed that multiple appliances could not be plugged in at the same time throughout the house. Doing so would result in overloading the electrical breaker. Brooks reported the electrical issue to Stanton soon after discovery.

135.      Stanton did not attempt to repair the electrical issue. Instead, Stanton attempted to convince Brooks that she was using too many items at once. Brooks was unconvinced because she was able to use her items all at once in the older home where she previously lived.

136.      To date, Brooks cannot plug in her appliances and items at the same time.

137.      Shortly after moving into her unit, Brooks noticed a sewage odor escaping from vents and pipes throughout the Brooks property. Brooks reported the smell to Stanton.

138.      Stanton failed to investigate, address, or rectify the sewage odor.

139.      To date, Brooks continues to suffer the sewage odor throughout the Brooks Property.

140.      Within six months after moving in, Brooks noticed that the rooftop slanted significantly towards the rooftop door causing rainwater to pool around the exterior of the rooftop door. The rainwater leaked into the Brooks Property causing water damage to the interior wall near the door. Brooks reported the rooftop water issue immediately to Stanton.

141.      The following week after Brooks report, Stanton removed the water-damaged drywall of the interior wall near the rooftop door. Stanton then patched the drywall. Stanton failed to address the slanted rooftop.

142.      After the next rainfall, the water once again pooled around the rooftop door. The water leaked into the Brooks Property and saturated the recently repaired interior wall.

143.     Soon after the repaired wall was damaged, Brooks reported the rooftop slant and water damage issue again to Stanton.

144.     Stanton failed to repair the rooftop slant. Stanton failed to seal the rooftop door. Stanton failed to repair the water-damaged interior wall near the rooftop door.

145.     To date, the water damage to the interior wall near the rooftop door and the rooftop door worsens with every rainfall. Black mold has appeared along the bottom of the rooftop door and the interior wall due to the water damage, as reflected in the photograph below from July 2019.



146.     Within six months after moving in, Brooks discovered mold forming along the window sills and various interior walls throughout the Brooks Property.

147.     Brooks reported the mold issue to Stanton immediately.

148.     Soon after the report, Stanton superficially cleaned the mold forming along the window sills and on various interior walls throughout the Brooks Property.

149.     To date, the mold around the window sills and various interior walls continues to reappear. While inside the Brooks Property, Brooks experiences migraines and severe allergies.

150.     Within six months of moving in to the Brooks Property, Brooks discovered a crack in the floor of her master bathroom's shower. As a result, water leaked from the shower to the main living area. The couch in Brooks's main living area was damaged as a result. Brooks paid approximately $4,000 to replace the damaged couch. Brooks reported the issue to Stanton immediately.

151.     Soon after Brooks report, Stanton inspected the crack and patched the shower floor.

152.     However within 30 days, the crack reemerged. Brooks reported the issue to Stanton once more.

153.     Stanton failed to repair the cracking in Brooks' shower floor.

154.     To date, the crack in Brooks' shower floor has not been repaired.

155.     Within eight months of moving in, Brooks noticed openings in the walls throughout the Brooks Property, along the interior of the window sills, and along the staircase. Brooks reported all of them immediately.

156.     Stanton told Brooks to wait and indicate the locations of the openings when Stanton conducted its one year inspection.

157.     Stanton never conducted its end of warranty walkthrough of the Brooks property.

158.     To date, the openings throughout the Brooks Property have not been repaired.

159.      Within a year and a half of moving in, Brooks discovered that the exterior front door was not weather-treated, causing the door to be water damaged. The water damage created an open gap at the bottom large enough for a hand to pass under the exterior door. Brooks reported the issue to Stanton immediately.

160.      Soon after, Stanton painted over the water damage. Stanton failed to repair the gap under the exterior door. Stanton failed to replace the exterior front door. Stanton failed to weather-treat the exterior front door.

161.      To date, the Brooks continues to experience water damage and a large gap at the bottom of the exterior front door.

162.      On information and belief, Brooks' property defects and issues are the result of foundational and structural property defects.

**Davina Callahan**

163.      On or about November 3, 2017, Davina Callahan ("Callahan") purchased 1262 Talbert Street, SE, Unit #14A, Washington, DC 20020 (the "Callahan Property") from Defendants Stanton and/or Rivereast.

164.      Callahan purchased the property under the DC HPAP program.

165.      Callahan is a Black female resident and the condominium unit is located in Ward 8, which has a 92% Black population.

166.      Prior to purchasing the Callahan Property, Rivereast orally represented that every A unit could access their rooftop for residential uses. In fact, the purchase price for the Callahan unit was priced higher because of the rooftop access capability. Callahan could not and has not had access to the rooftop for residential uses since purchase.

167.     Within the first few months after moving in, Callahan noticed openings in the walls throughout the residence. Callahan notified Stanton.

168.     Stanton characterized the damage initially as typical new construction settlement-cracks and applied a flexi-corner drywall product to repair the damage.

169.     Soon after, the openings shortly reemerged in the repaired spots and in new spots. Callahan reported the openings to Stanton again.

170.     Stanton applied a flexi-corner drywall product to repair the damage.

171.     In October of 2019, Callahan discovered new openings throughout the Callahan Property and the repaired openings had reemerged. Callahan reported the reopenings to Stanton immediately.

172.     On October 30, 2019, Stanton informed Callahan that a structural engineer was reviewing the property.

173.     Callahan requested the structural engineer's report. Stanton failed to provide Callahan with the report.

174.     Stanton failed to repair the openings throughout the Callahan Property after the October 2019 report.

175.     On March 2, 2020, Callahan reported to Stanton that the drywall openings reported in October 2019 were widening and lengthening.

176.     Stanton failed to repair the reopenings throughout the Callahan Property after March 2, 2020.

177.     To date, the reopenings continue to widen and lengthen, particularly in the back of the home.

178.     In July 2019, Callahan noticed a leak from the roof into the laundry room. Callahan reported the issue to Stanton immediately.

179.     Soon after the report, Stanton removed the ceiling drywall and replaced the drywall. Stanton discovered black mold in the ceiling.

180.     Stanton inspected the rooftop and found that the rooftop door was causing the leakage. Stanton repaired the rooftop door.

181.     In July 2020, the ceiling leaked again from the roof into the laundry room. Callahan reported the issue to Stanton immediately.

182.     Stanton repaired the ceiling again and the rooftop door.

183.     To date, Callahan fears that the issue will occur again.

184.     On March 2, 2020, Callahan reported to Stanton that the exterior of the living room window appeared to coming apart.

185.     Stanton failed to repair the living room window.

186.     In May of 2020, Callahan reported to Stanton that the bedroom window and the window in the rear of the first level will not close.

187.     Stanton inspected the windows, but failed to repair the issue.

188.     To date, the living room window continues to appear as if it will come apart. The bedroom window and the window in the rear of the first level need excessive force to close.

189.     On information and belief, Callahan's property defects and issues are the result of foundational and structural property defects.

**Denine Edmonds**

190.     On or about October 27, 2017, Denine Edmonds ("Edmonds") purchased 1262 Talbert St SE Unit # 10B Washington DC 20020 (the "Edmonds Property") from Defendants Stanton and/or Rivereast.

191.     Edmonds purchased the property under the DC HPAP program.

192.     Edmonds is a Black female resident and the condominium unit is located in Ward 8, which has a 92% Black population.

193.     On January 16, 2018, Edmonds noticed the drywall cracking and opening throughout her home. Edmonds reported the openings immediately.

194.     Stanton characterized the damage as typical new construction settlement-cracks. Stanton told Edmonds that Stanton would repair the drywall after the one year inspection.

195.     On June 5, 2018, Edmonds noticed more openings in different places throughout the home. Edmonds specifically reported that the shape of the drywall openings in the downstairs bedroom appeared as if the wall was going to fall.

196.     On June 20, 2018, Stanton repaired the openings in the wall.

197.     In August of 2018, Edmonds moved out of her Property for Stanton to do extensive repairs. Edmonds moved out and into another unoccupied unit in the complex for 14 days. Stanton did not cover any moving expenses.

198.     Stanton repaired uneven flooring and drywall openings throughout Edmonds Property.

199.     On November 20, 2018, Edmonds reported more openings in the drywall to Stanton.

200.    On July 14, 2019, Edmonds again reported extensive openings throughout the home.

201.    On September 11, 2019, Edmonds again reported continued openings throughout her home. She also reported that the back door had shifted to the point where it cannot close because the lock mechanism is no longer aligned with the door frame.

202.    On September 13, 2019, Stanton repaired the back door.

203.    To date, the openings in the drywall continue to appear despite Stanton's attempts to "repair" them. Edmonds has observed pieces of the wall falling off. Edmonds also asserts that the wall in her downstairs bedroom--her 16 year old son's room, appears to be on the verge of collapse. The following photos were taken on September 1, 2020.





204.    On or around January 12, 2019, Edmonds noticed substantial openings around her front window on the first floor. Edmonds noticed that water leaked onto the window sill on rainy days. Edmonds reported the issue to Stanton immediately.

205.    A few days after the report, Stanton caulked the area around the window.

206.    On June 13, 2019, the front window began to leak again.

207.    Soon after, Stanton attempted to superficially repair the window.

208.     To date, the openings around the front window have reappeared and widened.

The following photos were taken on September 1, 2020.

 

209.     On November 19, 2017, Edmonds first noticed that the toilet and tub in the

downstairs bathrooms would fill up with sewage waste every time she ran the water in

her master bathroom. Edmonds reported the issue to Stanton immediately.

210.     A few days after the report, Stanton sent a plumbing company out to Edmonds

Property. The issue was temporarily resolved.

211.     Within 6 months of the repair, the issue resurfaced. Edmonds decided to hire a

3rd party plumber. The plumber repaired the issue.

212.     On August 31, 2018, Edmonds noticed a strong sewage odor coming from the

toilets and sinks. Edmonds reported it to Stanton immediately. Stanton told Edmonds that

the smell was coming from DC water purification plant. Stanton failed to repair the issue.

213.     On October 3, 2018, Edmonds noticed a strong sewage odor from dishwasher. Edmonds reported the issue to Stanton. Stanton failed to repair the issue.

214.     In November of 2020, a pipe collapsed underneath her home causing all the bathrooms in her property to be inoperable. Edmonds notified REGCUOA's property management company, Quality1 Property Management ("Quality1"), and Stanton.

215.     The issue has yet to be repaired.

216.     Stanton refuses to repair any further issues stating that Edmonds' warranty has expired.

217.     On information and belief, Edmonds learned from Quality1 that another person in the community experienced a collapsed pipe and Stanton fixed her issue, despite the expiration of her warranty.

218.     As a result of the plumbing issues and the uninhabitability of her property, Edmonds was forced to move out of her home. Edmonds moved in with a relative on December 14, 2020, and has no idea when she will have access to her home again.

219.     On January 4, 2021, Edmonds checked on her Property and discovered that

water was flowing from the ceiling and walls of one of her downstairs bedrooms.

Edmonds notified Quality1 Property Management Company. The following photos were

taken on January 4, 2021.




220.     Quality 1 sent out a plumber who could not figure out how to shut off the

water to the particular pipe that ran along the downstairs bedroom. The plumber left

without resolving the issue.

221.     To mitigate further damage to her personal property, Edmonds contacted a

friend who figured out how to turn off the water.

222.     The plumber sent by Quality1 returned the next morning and determined that

the leak was caused by the pipe to the refrigerator's ice maker. The plumber informed

Edmonds that she could no longer use her ice maker.

223.    On January 4, 2021, counsel contacted the DC OAG regarding Plaintiff Edmonds' unit issues and the fact that her unit was flooded and that she was displaced. The OAG representative responded on January 5, 2021, that "given that the issues continue to persist, this matter has been elevated and assigned to an attorney in the Office of Consumer Protection to review for the potential for enforcement purposes." To date, no further action has been taken.

224.    On information and belief, Edmonds' property defects and issues are the result of foundational and structural property defects.

**Ciera Johnson**

225.    On or about June 15, 2018, Ciera Johnson ("Johnson") purchased 1262 Talbert Street, SE, Unit #7B, Washington, DC 20020 (the "Johnson Property") from Defendants Stanton and/or Rivereast.

226.    Johnson purchased the property with the assistance of the DC HPAP program.

227.    Johnson is a Black female resident and the condominium unit is located in Ward 8, which has a 92% Black population.

228.    Upon purchasing the Johnson Property, Johnson was told by neighbors that the unit had experienced a cave in on the first floor before she purchased the property.

229.    At no time did Defendants Stanton or Rivereast inform Bennett of the cave in on the first floor.

230.    Upon moving in, Johnson reported to Stanton the significant crack on the balcony that was large enough for a hand to fit through.

231.    Stanton failed to repair the significant crack on the balcony.

232.     On or around June 20, 2019, Johnson reported the significant crack on the balcony to Stanton, again.

233.     Stanton failed to repair the significant crack on the balcony.

234.     To date, the significant crack on the balcony has not been repaired and continues to widen.

235.     On October 26, 2018, Johnson reported major openings and gaps in the floors and walls throughout the Johnson Property to Stanton.

236.     On or around December 23, 2018, Stanton applied a flexi-corner drywall product to only the walls to repair the openings.

237.     The openings reappeared, along with new openings in the walls within months after Stanton's previous attempt to repair.

238.     On May 02, 2019, Johnson reported to Stanton the major openings on the walls throughout the Johnson Property

239.     In or around December 2019, Stanton applied a flexi-corner drywall product to the walls to repair the openings.

240.     To date, the openings and gaps repaired in December 23, 2018, and December 2019, have reemerged and new openings have also appeared. The openings continue to lengthen with time. The following photos depicting an opening in the floors was captured in May of 2020.

 

241.    The following photo depicting an opening in the wall was captured in December of 2020.



242.    On October 26, 2018, Johnson reported to Stanton that the tiles in the master bathroom were inexplicably cracking.

243.    Stanton contacted Johnson to arrange a time to replace the bathroom tiles. However, due to conflicting schedules, the parties could not agree to an appropriate time. Stanton eventually dropped the plans to fix the bathroom tiles.

244.    On May 02, 2019, Johnson reported to Stanton, again, that the tiles in the master bathroom were cracked.

245.    Stanton failed to repair the cracked bathroom tiles.

246.    To date, the tiles in the master bathroom remain cracked.

247.    On October 26, 2018, Johnson reported to Stanton a sewage odor coming for various sinks in the Johnson Property.

248.    Stanton failed to inspect or repair the odor.

249.    To date, the sewage odor from the sinks comes and goes throughout the Johnson Property.

250.     On October 26, 2018, Johnson reported to Stanton a mildew odor in the downstairs hallway. Johnson suspects mold.

251.     Stanton failed to repair the odor.

252.     To date, the mildew odor in the downstairs hallway comes and goes.

253.     On October 26, 2018, Johnson reported to Stanton that the flooring in the kitchen was slanted.

254.     Stanton failed to inspect the slanted kitchen flooring. Stanton failed to repair the slanted kitchen flooring.

255.     To date, the slanted kitchen floor has not been repaired.

256.     On October 26, 2018, Johnson reported to Stanton that the ceiling above the staircase swelled and bulged to the point where Johnson feared that it would cave in.

257.     On or around December 23, 2018, Stanton inspected the drywall above the staircase. Stanton removed and replaced the drywall above the staircase.

258.     To date, the ceiling above the staircase has once again swelled and bulged.

259.     On May 02, 2019, Johnson reported to Stanton a large opening on the exterior wall of Unit 5B from the top of building to the foundation.

260.     Stanton failed to repair the large opening on the exterior wall.

261.     To date, the large opening on the exterior wall of Unit 5B has widened.

262.     On May 02, 2019, Johnson reported to Stanton that the flooring on the top level was slanting.

263.     Stanton failed to inspect the slanting in the top level flooring. Stanton failed to repair the slanting in the top level flooring.

264.     To date, the slanted top level flooring has not been repaired.

265.     On May 02, 2019, Johnson reported to Stanton the gaps along the bottom of the exterior front door.

266.     Stanton failed to inspect the gaps along the bottom of the exterior front door.

267.     In or around August 2020, Johnson's fiancée caulked the gap along the bottom of the exterior front door.

268.     Within only four months, the gap along the bottom of the exterior front door reemerged.

269.     To date, the gap along the bottom of the exterior front door continues to widen.

270.     On May 02, 2019, Johnson reported to Stanton that the front of the building appears to be tilting. Johnson suspects foundational issues.

271.     Stanton failed to repair or address the issue that the building appears to be tilting.

272.     To date, the building continues to appear as if it is tilting.

273.     On or around June 20, 2019, concerned about the substantial cracking in the flooring, previously reported to Stanton on October 26, 2018, Johnson hired Soil & Structure Consulting, Inc. to perform a residential structural evaluation.

274.     The residential structural evaluation cited the following issues: (1) cracks large enough for a pencil to enter appeared in the concrete slab close to the front wall and in the bedroom close to rear side has cracks, (2) the kitchen floor slopes, (3) cracks in the rear foundation wall, and (4) cracks on the concrete slab close to the front wall where it was repaired previously.

275.     Soil & Structure Consulting recommended that the front and rear foundation wall be stabilized by installing steel push piers along the front and rear foundation wall.

276.     Soon after the evaluation, Johnson provided a copy of the structural evaluation to Defendants Stanton, REGCUOA, and DCDHCD.

277.     On January 3, 2020, Stanton sent an inspector to inspect the Johnson Property. The inspector performed an inspection similar to that of Soil & Structure Consulting.

278.     Johnson has requested Stanton to provide the report prepared by Stanton's inspector. Stanton has failed to provide the report to Johnson.

279.     In the summer of 2020, Johnson noticed that she could not close the back door. Johnson suspects that the rear of the Johnson Property is sinking, which causes the back door to swing out. The weight of the door pushing against the door knob mechanism has made it impossible to close the back door without dead bolting the top lock and propping the back door with a wedge.

280.     The sinking issue has affected all of the other doors in the home. If the doors are not completely closed, they will swing all the way open without any force.

281.     Johnson has not reported the door issues to Stanton because Stanton has made it clear that it will no longer repair issues in the Johnson Property as the one year warranty has passed.

282.     On or around June 26, 2020, Stanton hired Geo Technical Solutions ("GTS") who dug under the basement concrete slab. GTS told Johnson that they only found wet soil and water under Johnson's basement concrete slab. GTS said that Stanton did not sufficiently compact the dirt prior to building.

283.     In response to GTS' findings, Stanton simply poured a new concrete slab in Johnson's Basement. Stanton failed to address the wet dirt issue.

284.     To date, a crack has appeared in the new basement concrete slab.

285.     In or around September 2020, Johnson noticed a sewage odor outside of the Johnson Property. Johnson observed that the soil behind the Johnson Property was wet and swamp-like.

286.     Johnson did not report the sewage odor behind the Johnson Property to Stanton because Stanton has made it clear that it will no longer repair issues in the Johnson Property as the one year warranty has passed.

287.     Currently, Johnson does not smell the sewage odor behind the Johnson Property.

288.     On September 15, 2020, Johnson gave birth to her daughter, Luna Autumn Adams. Johnson admits that she is scared to live in the Johnson Property with her newborn child.

289.     On information and belief, Johnson's property defects and issues are the result of foundational and structural property defects.

**Robin McKinney**

290.     On or about December 3, 2017, McKinney purchased 1262 Talbert Street, SE, Unit #15A, Washington, D.C. 20020 (the "McKinney Property") from Defendants Stanton and Rivereast.

291.     McKinney purchased the property with the assistance of the DC HPAP program.

292.     McKinney is a Black female resident and the condominium unit is located in Ward 8, which has a 92% Black population.

293.     Prior to purchasing the McKinney Property, Rivereast orally represented that every A unit could access their rooftop for residential uses. In fact, the purchase price for the McKinney unit was priced higher because of the rooftop access capability. McKinney could not and has not had access to the rooftop for residential uses since purchase.

294.     In the spring of 2018, McKinney noticed rainwater pooling in uneven on the roof and around the rooftop door. McKinney reported the issues immediately to Stanton.

295.     Soon after the report, Stanton inspected the water pooling. Stanton failed to repair the rainwater pooling issue.

296.     To date, water continues to pool throughout the roof and around the rooftop door to the extent that mushrooms have appeared around the rooftop door.

297.     On November 26, 2018, McKinney reported openings in the walls throughout the McKinney Property to Stanton.

298.     Stanton failed to repair the wall openings reported on November 26, 2018.

299.     On December 3, 2018, McKinney reported, again, that the walls were widening in the same places as reported in November 2018 and in new places throughout the McKinney Property.

300.     Stanton failed to repair the openings reported on both November 26, 2018 and December 3, 2018.

301.     On April 23, 2019, McKinney reported, for a third time, that the walls were opening and separating throughout the McKinney Property.

302.     Stanton still failed to repair the openings reported on November 26, 2018, December 3, 2018, and April 23, 2019.

303.     To date, the reported openings continue to lengthen and widen to the point where McKinney's 16-year old son expressed that he was afraid to sleep in his bedroom where the gaps are the worst. The following phot was captured on December 22, 2020.



304.     On December 3, 2018, McKinney reported to Stanton that the framing around the rooftop door, front door, closet doors, and bathroom doors were shifting, leaving a one-inch gap at the bottom of the doors. The shifting made it difficult to close or lock the doors.

305.     About a month after the December 2018 report, Stanton only repaired the front door.

306.     On or around April 23, 2019, McKinney noticed that the front door began to shift again. McKinney notified Stanton immediately.

307.     After the April 2019 report, Stanton failed to repair the front door again.

308.     At no point did Stanton repair the rooftop door, closet doors, or the bathroom doors.

309.     To date, the aforementioned doors continue to shift resulting in a large gap at the bottom of the door and difficultly closing and locking the doors.

310.    On November 30, 2018, McKinney reported that flooring throughout the first level of the McKinney Property was slanted and needed to be leveled.

311.    Stanton failed to repair the uneven flooring.

312.    To date, the flooring in the McKinney Property remains uneven.

313.    On December 3, 2018, McKinney reported openings around several window frames throughout in the McKinney Property allowing cold air to enter the home.

314.    Stanton failed to repair the openings around the window frames.

315.    To date, the openings around the windows frames continues to allow air into the McKinney Property.

316.    On information and belief, McKinney's property defects and issues are the result of foundational and structural property defects.

**Subcontractor Defendants**

317.    In 2014, Defendant Rivereast  entered into a contract with Defendant Stanton, a general contractor for construction of Talbert Street.

318.    At some point in 2014 and before the completed construction, Stanton  and/or Rivereast or its authorized agent entered into contract with SGA to provide architectural services, including the preparation of drawings, plans, specifications, and other design documents for Talbert Street.

319.    At some point in 2014 and before the completed construction, Stanton  and/or Rivereast or its authorized agent entered into contract with Maddox, to perform surveying services, pursuant to which Maddox produced construction grade sheets and drawings for Talbert Street.

320.     At some point in 2014 and before the completed construction, Stanton  and/or Rivereast or its authorized agent entered into contract with Skarda to provide structural consulting, pursuant to which Skarda produced drawings and guidance for Talbert Street.

321.     At some point in 2014 and before the completed construction, Stanton  and/or Rivereast or its authorized agent entered into contract with CDDI to provide a Final Geotechnical Engineering Study for Talbert Street ("Geotechnical Study").  CDDI's scope of work included visiting and observing the site conditions, staking out and drilling soil test borings, analyzing groundwater levels, lab testing samples, and providing a final report with recommendations regarding the further work on the Property.

322.     CDDI's Geotechnical Study was to include a summary of field and lab investigation results, subsurface conditions, foundation bearing capacity, recommendations for the design of the site geogrid reinforced retaining walls, and recommendations for pavement support and earthwork.

323.     At some point in 2014 and before the completed construction, Stanton  and/or Rivereast or its authorized agent entered into contract with FES for the construction of retaining walls at Talbert Street, including, but not limited to, the top modular retaining wall ("Third Wall").

324.     At some point before the completed construction, Stanton  and/or Rivereast or its authorized agent entered into contract with M&F to furnish and provide concrete-related work on Talbert Street.

325.     Almost immediately upon occupancy, residents of Talbert Street began to notice and complain to Stanton and/or Rivereast regarding structural issues and problems at Talbert Street.

326.     Stanton and/or Rivereast admitted that they advised residents that structural issues were normal for new construction and standard settling and advised Plaintiffs to wait until the end of the one-year warranty period.

327.     Based upon Stanton's investigations, several problems were discovered, including inadequate foundation design, detailing, and construction, all of which, individually and collectively, have resulted in substantial cracking and separation in a number of the units at the Property.

328.     The work of the Defendants was faulty, negligent, not in accordance with the plans and specifications for the Property, and not in accordance with industry standards.

329.     SGA failed to, without limitation, properly design plans, drawings, and/or specifications for the Property and failed to ensure that the contractors' work on the Property was in conformance with the existing plans, drawings, and/or specifications.

330.     Maddox misapprehended the construction design documents and, without limitation, failed to provide accurate surveying data.

331.     Skarda misapprehended the construction design documents and, without limitation, failed to provide accurate drawings and guidance for the Third Wall, among other things.

332.     CDDI failed to properly conduct soil, water, and subsurface investigation; analyze the results of the same; and supervise the soil compaction process under the CDDI Contract. This includes, without limitation, properly testing the soils for their suitability as fill material and not testing that the soils were properly compacted, all of which allowed for structures to be constructed on improperly compacted soils.

333.     FES failed to construct the Third Wall, among other things, in a good and workmanlike manner. This includes, without limitation, failing to ensure that work on the Property was performed in conformity with the plans and specifications and in conformity with law.

334.     M&F failed to perform concrete pouring, analysis, and supervision work in a good and workmanlike manner. This includes, but is not limited to, failing to pour footers properly and leaving sections of the foundation and exterior and interior walls without proper support.

**Affordable Housing Under the Housing Production Trust Fund Program ("HPTF")**

335.     On September 12, 2014, the District of Columbia executed a loan agreement to loan Rivereast Six Million Three Hundred Ten Thousand Seven Hundred Eight-Eight Dollars and No Cents ($6,310,788.00) in Housing Production Trust Fund Program funds, Contract No. DC-DHCD-2014-28, "for the purpose of funding acquisition, construction, and development financing costs for 46 affordable rental housing units to be constructed on property located at 1260-1272 Talbert Street, SE, Washington D.C."[4]

336.     On September 12, 2014, the District of Columbia and Rivereast executed a Declaration of Covenants ("Affordability Covenant") in favor of the District of Columbia, which was recorded in the DC Recorder's Office as Instrument No. 2014086808. The Affordability Covenant provides that pursuant to the HPTF Statutes, Rivereast covenants that the Property shall be operated as "continuously affordable rental housing" to be occupied "exclusively to low-Income Households, Very Low-Income

---

[4] Exhibit A, p. 1. Exhibit A is incorporated fully herein.

Households and Extremely Low-Income Households" for a period of not less than forty (40) years. *Id.* at pp. 1-2.

337.     On April 27, 2017, the District of Columbia and Rivereast entered into an agreement whereby Rivereast was required to "repay" the District of Columbia $1,890.626.00 of the original $6,310,788.00 loan amount, with the remaining principal balance of $4,420,162.00 to be "assumed in proportionate shares by the eligible purchasers of the 46 units." *Id.* at p. 2.

338.     In accordance with D.C. Code § 42-1904.04, Defendant Rivereast filed a Public Offering Statement ("POS") with the Office of the Mayor. [5]

339.     The POS "discloses fully and accurately the characteristics of the condominium and the units therein offered and shall make known to prospective purchasers all unusual and material circumstances or features affecting the condominium." D.C. Code § 42-1904.04(a). *Id.,* p. 7.

340.     The POS discloses that the Architect of Record is SGA Companies, 7508 Wisconsin Avenue, 4th Floor, Bethesda, MD 20814. *Id.*

341.     The POS discloses that the Surveying Engineer is Maddox Engineers & Surveyors, Inc., 3204 Tower Oaks Blvd. Suite 200-A, Rockville MD 20852. *Id.*

342.     The POS further discloses that the subject property commonly known as 1262 Talbert Street, S.E. Washington D.C. 20020 is "new construction that was built by Declarant to contain forty-six (46) residential condominium units (the 'Residential Units'), forty (40) limited common element parking spaces (the 'Parking Spaces'), and certain other general and limited common elements." *Id*.

---

[5] Exhibit B is incorporated fully herein.

343.     The POS further discloses that the units "are subject to the Department of Housing and Community Development ("DHCD") Housing Production Fund ("HPTF") Declaration of Covenants." *Id*. Further, that "the intent of the HPTF Declaration of Covenants is to create affordable housing in the District of Columbia." *Id*.

344.     The POS further discloses that "the HPTF Declaration of Covenants contains covenants regarding the development, marketing, sale, occupancy, and leasing of certain units in the Condominium as affordable units (the "Reserved Unit(s)") for a period of fifteen (15) years from the date of sale…" *Id*.

345.     The POS further discloses that the Unit Owners of the Reserved Units referred to as "Eligible Purchasers" and that the "Reserved Units shall only be sold to Eligible Purchasers, as defined in the HPTF Declaration of Covenants during the [relevant period]." *Id*.

346.     Finally, the POS discloses that "*All forty-six (46) Residential Units* in the Condominium are Reserved Units, as defined in the HPTF Declaration of Covenants." *Id*. (emphasis added).

**Engineering and Evacuation Assessments**

347.     Multiple engineering reports citing structural, health and safety issues have been completed regarding the condition of Talbert Street and hereby incorporated fully herein:

   a.   January 20, 2021 – The Transition Engineering Evaluation (Exhibit C);

   b.   August 16, 2021 – Evacuation Recommendation Notice (Exhibit D);

   c.   September 1, 2021 – Structural Evaluation (Exhibit E);

    d.   May 13, 2022 Phase I Geotechnical Investigation and Recommendation Report (Exhibit F);

    e.   July 29, 2022 – Structural Building Assessment Supplemental Report (Exhibit G); and

    f.   January 24, 2023 --  Talbert Street Remediation, Structural Engineering Peer Review Prepared for Government of the District of Columbia (Exhibit H).

348.     A comprehensive structural assessment of all buildings on August 11 – 13, 2021 ("Assessment") revealed that the nature and extent of the damages are consistent with the Property's foundation and its structural systems being compromised. Exhibit E, pp. 5, 7).

349.     The Assessment further determined that the instability of the foundation is worsening due to underground water and sewer line breaks, thereby causing uncontrolled wastewater to be discarded under and adjacent to the retaining walls along the Property on Morris Road. *Id.*

350.     The soil subsidence, soil slippage, and possible water surcharging has caused the stability of the Keystone wall to be in jeopardy. It has yet to be learned with specificity, but construction defect may also be contributing to the potential failure of the Keystone wall. Continued slippage of the Keystone wall and potential overturning or blow-out could be *catastrophic* for the building.[6]

351.     In virtually every case of a construction failure the causation, or fault, of the failure is due to a failure or failures of the parties responsible for the design and/or the construction of the project.[7]

---

[6] Exhibit E, p. 14. (emphasis added).
[7] Exhibit I, p. 2. Exhibit I is incorporated fully herein.

352.     Construction failures are typically the responsibility of the designer (architectural team) or the general contractor (construction team) or some combination of both. *Id.*

353.     The designer or architectural team and construction team include Stanton, Rivereast, SGA, Maddox, Skarda, CDDI, M&F, and FES, among others.

354.     The developer/builder (contractor) share in the responsibility for damages due to their knowledge early in the project of significant structural problems but provided no solutions. *Id.,* p.7.

355.     The design structural engineer for the original project appears to share in the responsibility for damages due to variable foundation types embedded to different depths in the soil. *Id.*

356.     The geotechnical engineer for the original project may have a share of responsibility for damages depending on their role during construction (testing and inspections). *Id.*

357.     The contractor/subcontractor who installed the geogrid apparently did not install the geogrid material in a manner to develop a tension load at the time of construction. *Id.*

358.     On August 16, 2021, as a result of these findings and out of an abundance of caution for the health and safety of the residents, an evacuation of the Property by all residents and units by August 30, 2021, was issued. Exhibit D.

359.     To date, the residents and their families of Talbert Street remain homeless and in temporary housing, are required to continue paying their mortgages on homes they

cannot occupy, and have not been given any further assurances or information as to when they will be able to return to their homes.

360.     On or around October 9, 2021, notwithstanding the District's[8] disclaimers of any responsibility for the Property that it funded or administered the Project (notwithstanding a nearly 7 million loan for its construction), Mayor Muriel Bowser created the "Talbert Street Task Force" to "help" residents address their housing and safety needs.

361.     To date, the Task Force has not presented any resolution of the issues regarding the extreme danger that the unstable building poses to the community the housing and safety needs of the Property's residents.

## COUNT I
### (Consumer Protection Procedures Act)
### (Defendants: Stanton, Rivereast, and DCDHCD)

362.     Plaintiffs hereby incorporate by reference all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

363.     Plaintiffs are all consumers who purchased condominium units from Stanton and/or Rivereast as first-time homebuyers in accordance with D.C. Code §28-3901(a).

364.     Defendants Stanton and/or Rivereast are persons under D.C. Code §28-3901(a)(1).

365.     Defendants Stanton and/or Rivereast misrepresented to Plaintiffs the quality of the condominium units' construction, the cause and remedy for the defects from the poor quality of construction, misled and/or deceived the Plaintiffs regarding the quality and

---

[8] The dismissal of the District and the Property's Condominium Association are on appeal to the D.C. Court of Appeals

standards of the construction and/or renovation, and other misleading and unfair representations in violation of D.C. Code § 28-3904.

366.     Defendant DCDHCD is a person under D.C. Code §28-3901(a)(1).

367.     DCDHCD's mission is to produce and preserve opportunities for affordable housing and economic development and to revitalized underserved communities in the District of Columbia. DCDHCD has three strategic objectives: (1) producing and preserving the supply of quality affordable housing; (2) increasing homeownership opportunities; and (3) revitalizing neighborhoods, promoting community development, and providing economic opportunities.

368.     DCDHCD awarded and continues to award Stanton and/or Rivereast and their affiliated parties under numerous other corporate structures millions of D.C. taxpayer and federally granted dollars to promote its affordable housing mission and objectives.

369.     DCDHCD awarded millions of taxpayer dollars to Stanton and/or Rivereast under D.C.'s Housing Production Trust Fund for purposes of construction/renovation of the subject Grand View Estate condominiums.

370.     DCDHCD funded, promoted, and facilitated the substandard construction of Grand View Condominiums by Stanton and/or Rivereast and is therefore liable under D.C. Code §28-3901.

371.     Defendants DCDHCD, Stanton, and Rivereast failed to ensure compliance with applicable codes and regulations related to the construction of the subject properties.

372.     In accordance with DC Code§§ 28-3905(k)(1)(A) and 28-3904, Defendants are liable to Plaintiffs for violations of unfair and deceptive trade practices.

373.     All Plaintiffs suffered damages as a result of Defendants' violation of Plaintiffs' consumer protections.

## **COUNT II**
### **(D.C. Human Rights Act)**
### **(Defendants: Stanton, Rivereast, and DCDHCD)**

374.     Plaintiffs hereby incorporate by reference all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

375.     All Plaintiffs are all Black female first-time homebuyers who wanted to participate in the American dream.

376.     The condominium project is located in Ward 8, which has a 92% population of Black residents.

377.     The condominiums are predominantly, if not exclusively, owned by Blacks.

378.     Defendants Stanton and/or Rivereast were provided government dollars and/or credits to provide affordable housing in DC where the population is 92% Black.

379.     Each of the Black female Plaintiffs' purchased a condominium from Defendants Stanton and/or Rivereast, funded in large part by DCDHCD.

380.     Defendants Stanton, Rivereast, and DCDHCD discriminated against Plaintiffs on the basis of their race, sex, and/or income status and denied them property, services, products, and treatment on an equal basis to white, male, and/or higher income individuals.

381.     Defendants Stanton, Rivereast, and DCDHCD discriminated against Plaintiffs on the basis of race by denying them affordable quality housing that was safe and structurally sound as was provided to similarly situated white residents of Defendants'

properties and residents in predominantly white-populated wards in the District of Columbia.

382.     Defendants Stanton, Rivereast, and DCDHCD discriminated against Plaintiffs on the basis of sex by denying them affordable quality housing that was safe and structurally sound as was provided to similarly situated male residents of Defendants' properties.

383.     Defendants Stanton, Rivereast, and DCDHCD discriminated against Plaintiffs on the basis of source of income by denying them affordable quality housing that was safe and structurally sound as compared to similarly situated individuals in Defendants' properties who are not required to seek housing through affordable housing programs.

384.     On information and belief, Defendants Stanton, Rivereast, and DCDHCD provide safer and more structurally sound construction, as well as substantively better and timelier responses and repairs to individuals in other areas of the District that are or substantially more white, higher income, and with male heads of households.

385.     Defendants Stanton, Rivereast, and DCDHCD are liable for violations of D.C. §2-1402.01 et seq.

386.     Among other relief, Plaintiffs request that the Court refer Defendant Stanton and Rivereast and their officers and representatives to the appropriate licensing agencies of the D.C. government for revocation and/or suspension of benefits under any license or permit, for their failure to operate responsibly in the public interest under D.C. §2-1403.17(b).

387.     Among other relief, Plaintiffs request that the Court order DCDHCD to cease any and all funding and other affiliation or business with Stanton, Rivereast and their officers and representatives under the DCDHCD programs.

388.     All Plaintiffs suffered as a result of Defendants' human rights violations against Plaintiffs.

**COUNT III**
**(Warranty Against Structural Defects)**
**(Defendants: Stanton and Rivereast)**

389.     Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

390.     DC Code § 42-1903.16 required Defendants Stanton and/or Rivereast to warrant against structural defects in the components of the units installed by Stanton and/or Rivereast or word one on the units by Stanton and//or Rivereast for two years after each unit was conveyed to a purchaser.

391.     Each unit was first conveyed to a Plaintiff purchaser on or after July 2017.

392.     The Plaintiffs' units suffer from structural defects and the stability or safety of the unit structures are below standards commonly accepted in the real estate market and restricts the normally intended use of all or part of the structural units. The structural defects require repair, renovation, restoration, or replacement immediately.

393.     These structural defects existed at the time of each Plaintiffs' purchase and continues to exist to this date.

394.     Defendants were notified of the structural defects by each of the Plaintiffs as early as July 2017, and on numerous occasions throughout the last three and a half years.

395.     The structural defects existed at the beginning of each Plaintiff's purchase.

396.     The unit defects existed and/or occurred within two years of first Plaintiffs' purchase in July 2017.

397.     DC Code § 42-1903.16 also required Stanton and/or Rivereast to warrant against structural defects in components of the common elements installed by Stanton and/or Rivereast or work done on the common elements by Stanton and/or Rivereast for two years after the first unit as conveyed to a purchaser.

398.     Defendants Stanton and/or Rivereast were obligated to remedy the common element and unit defects within a reasonable time.

399.     Defendants Stanton and/or Rivereast have breached their duties under DC Code § 42-1903.16.

400.     Defendants Stanton and Rivereast knew or should have known about the structural defects on or before building completion or at least July 2017.

401.     Only upon notice to DCDHCD, Stanton or Rivereast posted the requisite 10% bond, letter of credit, or other form of security to satisfy any costs that arise from the developer's failure or inability to fulfill its warranty obligations to repair structural defects in accordance with D.C. §42-1903.16(e)(1) in August 2019—more than two years after construction and after complaints were made to DCDHCD.

402.     Stanton and/or Rivereast are liable in an amount equal to the reasonable cost of repairing, renovating, restoring, or replacing the defects for all structural defects and specific unit defects for Plaintiffs outlined herein.

403.     All Plaintiffs suffered damages and loss of use and enjoyment of their properties as a result of Defendants' breach of its warranty against structural defects.

**COUNT IV**
**(Misleading Statement in a Public Offering Statement)**

**(Defendants: Stanton and Rivereast)**

404.     Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

405.     Under D.C. Code § 42-1904.02(d), Defendants made false and/or misleading statements about the structural and/or foundational compliance and stability of the subject properties.

406.     Defendants knew or should have known that the design and construction of the subject properties was based on structural and foundational defects.

407.     Defendants' Public Offering Statement represents that it is in compliance with all applicable housing codes, building codes, and similar laws affecting the Condominium.

408.     Plaintiffs purchased subject properties based on the Defendants' Public Offering Statements that the subject properties were safe, properly constructed and in compliance with all applicable codes and regulations.

409.     All Plaintiffs suffered damages as a result of Defendants' misleading statements

**<u>COUNT V</u>**
**(Negligent Construction)**
**(Defendants: Stanton and Rivereast)**

410.      Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

411.     Defendants Stanton and/or Rivereast negligently constructed River East Grandview Condominiums.

412.     Defendants Stanton and Rivereast used improper construction methods that deviated from applicable building codes and industry standards; and/or implemented

defective construction supplies or methods with respect to River East Grandview Condominiums.

413.    Defendants Stanton and/or Rivereast failed to supervise, inspect, or prevent defective design and/or construction of the River East Grandview Condominiums.

414.    All Plaintiffs suffered damages and loss of use and enjoyment of their properties as a result of Defendants' negligent construction.

### <u>COUNT VI</u>
**(Breach of Contract)**
**(Defendants: Stanton, Rivereast, and DCDHCD)**

415.    Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

416.    Defendants Stanton and/or Rivereast failed to abide by the terms and conditions of the written purchase contract with Plaintiffs and/or other implied or explicit contracts with DCDHCD.

417.    Defendants' Stanton and/or Rivereast's responses to Plaintiffs included repeated statements that the defects in their units were the result of standard post-construction settlement and would simply cover up the cracks, for example, only for them to reappear and/or get bigger.

418.    Defendant DCDHCD failed to enforce or implement the contractual provisions between it and Stanton and Rivereast, including, but not limited to, enforcement of the warranty against structural defects security bond, property inspections, and/or certificates of occupancy.

419.    Plaintiffs were third-party beneficiaries who were reasonably expected to use, consume, or be affected by the goods and were injured by the breach of the warranty.

420.    All Plaintiffs suffered damages as a result of Defendants' breach of its contract with Plaintiffs and as third-party beneficiaries to the contract between Stanton/Rivereast and DCHDCD.

### COUNT VII
### (Breach of Implied Warranties)
### (Defendants: Stanton and Rivereast)

421.    Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

422.    Defendants Stanton and/or Rivereast breached their implied warranty of good faith and fair dealing.

423.    Defendants Stanton and/or Rivereast engaged in a pattern or practice of bad faith with all of the Plaintiffs regarding the numerous evidentiary complaints about the structural defects throughout the condominium units and common areas.

424.    Defendants Stanton and/or Rivereast made repeated misrepresentations regarding the causes of the defects and made cosmetic repairs to cover up the structural and substantive issues with the units.

425.    All Plaintiffs suffered damages as a result of Defendants' breach of implied warranties.

### COUNT VIII
### (Negligent Misrepresentation)
### (Defendants: Stanton and Rivereast)

426.    Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

427.    Defendants Stanton and Rivereast owe a duty of care to Plaintiffs.

428.     Plaintiffs relied upon Defendants' representations before, during, and after purchase that their subject properties were safe and structurally sound.

429.     Defendants made repeated statements to all Plaintiffs that the defects in their units were related to standard settlement processes and provided cosmetic patches to their units.

430.     Defendants knew or should have known that these representations were false and that Plaintiffs would rely on them.

431.     Based on these misrepresentations, Plaintiffs have been injured, including that they may have compromised their rights under applicable statutes of limitation and other rights of recovery under applicable D.C. statutes.

432.     All Plaintiffs suffered damages as a result of Defendants' negligent misrepresentations.

## COUNT IX
### (Negligence)
### (Defendant: REGCUOA)

433.     Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

434.     The REGCUOA owes a duty of care to the Plaintiffs. Its first and primary duty and obligation included proper evaluation of the construction of the condominium common elements and structural integrity of the condominiums.

435.     Defendant REGCUOA failed to exercise its duty of care and breached its duty of care when it failed to identify the structural defects in the condominium prior to taking over management of the condominium property from Stanton and/or Rivereast.

436.     Defendant REGCUOA did not conduct a transition deficiency study or similar analysis of Stanton and/or Rivereast's construction before taking over management of the condominium property from Stanton and/or Rivereast.

437.     All Plaintiffs suffered damages as a result of Defendant REGCUOA's breach and negligence.

### COUNT X
**(Negligence)**
**(Defendants: Stanton and Rivereast)**

438.     Plaintiffs hereby incorporates all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

439.     Defendants designed and constructed the subject properties, and therefore owed a duty of reasonable care to avoid causing harm to those that purchased their condominium units.

440.     At all times, Defendants had a duty to exercise reasonable care in the design and construction of the subject properties.

441.     Defendants were negligent, reckless, and careless and owed a duty to Plaintiffs to make accurate and truthful representations regarding their construction and/or renovation of the subject properties.

442.     At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards, defects, and dangers of the subject properties.

443.     Defendants breached their duties of reasonable care and failed to exercise ordinary care in the design and construction of the subject properties.

444.    Defendants knew and/or should have known that it was foreseeable that Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the design and construction of the subject properties.

445.    Plaintiffs did not know the extent of the injuries and harm that could result from the design and construction failures of the subject properties.

446.    All Plaintiffs suffered damages as a result of Defendants' negligent misrepresentations.

## COUNT XI
### (Fraud)
### (Defendants: Stanton and Rivereast)

447.    Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

448.    Defendants Stanton and/or Rivereast made false representations at or after the sale of the condominium units to each Plaintiff.

449.    Defendants Stanton and/or Rivereast knew or should have known that the condominium units were structurally and foundationally unsound and contrary to accepted standards.

450.    Defendants Stanton and/or Rivereast knew in July 2017, if not earlier, that there were repeated issues related to a number of units exhibiting structural and foundational defects, including, but not limited to, gaping openings and gaps of ceiling and walls separating from each other, gaping openings and gaps of walls and floors separating from each other; stairs separating from the floors; doors and windows separating and exposing large gaps; uneven floors, ceilings and roofs; plumbing failures and flooding; and ongoing mold and mildew.

451.     All of these property issues were cosmetically and temporarily corrected only to reappear on multiple occasions; representatives made statements that the issues were normal and not related to serious concerns; and delayed repairs beyond the warranty period to avoid responsibility and repair.

452.     Defendants Stanton and/or Rivereast intentionally deceived Plaintiffs by failing to disclose, when it had a duty to disclose, the foundational and structural repairs that were completed and/or necessary.

453.     All Plaintiffs suffered damages as a result of Defendants' fraud.

## COUNT XII
### (Strict Liability)
### (Defendants: Stanton and Rivereast)

454.     Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

455.     Plaintiffs purchased brand new condominium units.

456.     Within days or weeks of moving into their units, their homes reflected substantial defects, including damage that rendered their homes uninhabitable, dangerous, and/or hazardous.

457.     The Plaintiffs attempted to resolve these issues with Defendants but were repeatedly told that they were standard issues that would be resolved at the end of their warranty period.

458.     Defendants encouraged Plaintiffs to delay their repairs until the warranty period was to expire.

459.     Defendants' repairs, if they were cosmetically completed at all, reappeared within days weeks and, in some cases, after the purported warranty period ended.

460.     Plaintiffs' subject properties are defective, unreasonably dangerous, and based on hazardous construction.

461.     Defendants are strictly liable.

## COUNT XIII
### (Intentional Infliction of Emotional Distress)
### (Defendants: Stanton, Rivereast, and DCDHCD)

462.     Plaintiffs hereby incorporate all of the facts in the Complaint as if fully set forth herein and further alleges as follows:

463.     Plaintiffs purchased brand new condominium units. But, practically upon move in, the units began to show defects.

464.     Plaintiffs had to repeatedly document, complain, and request repairs and many repairs were cosmetic and only reappeared days later.

465.     Plaintiffs were repeatedly told by Defendants Stanton and Rivereast that their complaints were not legitimate complaints and that they were due to "normal" settlement or that mildew or mold were not of serious concern.

466.     During the repeated stress of her units issues, Plaintiff May went into premature labor and still had to return to a unit while recovering and with her vulnerable baby to an unsafe and structurally unsound home.

467.     Even when Plaintiff May tried to get assistance from DC government agencies, including sister agencies to Defendant DCDHCD, for a property that was largely financed *by the DCDHCD,* she was given violation citations and fined for the failure to repair the structural defects.

468.     Plaintiff May has extreme emotional suffering and stress about the known and unknown effects and potential damage to her and her family, including a young child, as a result of structural defects in her unit.

469.     Plaintiff Adenariwo has extreme emotional suffering and stress about the known and unknown effects and potential damage to her and her family, including a newborn child, as a result of structural defects in her unit.

470.     Plaintiff Bennett has extreme emotional suffering and stress about the known and unknown effects and potential damage to her and her family as a result of structural defects in her unit.

471.     Plaintiff Brooks has extreme emotional suffering and stress about the known and unknown effects and potential damage to her and her family as a result of structural defects in her unit.

472.     Plaintiff Callahan has extreme emotional suffering and stress about the known and unknown effects and potential damage to her and her family as a result of structural defects in her unit.

473.     Plaintiff Edmonds has extreme emotional suffering and stress about the known and unknown effects and potential damage to her and her family as a result of structural defects in her unit.

474.     Plaintiff Johnson has extreme emotional suffering and stress about the known and unknown effects and potential damage to her and her family, including a newborn child, as a result of structural defects in her unit.

475.     Plaintiff McKinney has extreme emotional suffering and stress about the known and unknown effects and potential damage to her and her family as a result of structural defects in her unit.

476.     Plaintiff Somerville has extreme emotional suffering and stress about the known and unknown effects and potential damage to her and her family, as a result of structural defects in her unit.

477.     Defendants Stanton and Rivereast subjected all Plaintiffs to multiple, serial, and prolonged loss of use and enjoyment of their property, including complete displacement of some of the Plaintiffs from their homes for periods of time.

478.     Plaintiffs have suffered for years because Defendants' delayed or dismissed their concerns and avoided rectifying structural and foundational issues.

<strong>COUNT XIV<br>(NEGLIGENCE AGAINST SGA)</strong>

479.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and further allege as follows:

480.     SGA acted as the Architectural firm on this Project.[9]

481.     According to D.C. Code §47-2853.61, Scope of Practice for Architects, "practice of architecture" means:

> rendering or offering to render services in connection with the design and construction, enlargement, or alteration of a structure or group of structures that have as their principal purpose human occupancy or habitation, as well as the space within and surrounding these structures. These services include planning and providing studies, designs, drawings, specifications, and other technical submissions, and the administration of construction contracts. The practice of architecture does not include the practice of engineering, as defined in § 47-2853.131, although an architect may perform engineering work that is incidental to the practice of

---

[9] Exhibit C, p. 8.

architecture.

482.     According to the American Institute of Architects ("AIA"), the general

services that an architect may provide includes feasibility study, preliminary design, final

design, construction bid evaluation and construction observation.[10]

483.     As the Property architect, SGA is the lead professional of the design team

and is responsible to hire additional subcontractors such as the civil engineer;

structural engineer; mechanical engineer; electrical engineer and geotechnical

engineer.[11]

484.     SGA breached their duty to Plaintiffs in the design of the Property. For

example, an engineering report cited two examples of unusual original design

configurations related to the foundation:[12]

   a.     The north end of the building is supported on different foundations
   extending to two different depths creating a condition of concentrated differential
   movements along the north wall.  The cantilever retaining walls will settle
   vertically as the supporting soils settle but will also naturally rotate in response to
   the retained earth, creating a lateral displacement, increasing up the height of the
   wall.  This movement will 'drag' the rest of the building through connections to
   the leaning north wall.  On the other hand, the adjacent shallow footings will tend
   not to move laterally and will only settle vertically to the degree that the
   supporting soils settle.

   b.     The foundation walls, shown on the design drawings, were to be cast-in-
   place concrete stabilized by Mechanically Stabilized Earth (MSE) (Figures 5 and
   6): that require regular spacing embedded anchors and backfill placed in 8-inch
   lifts while incorporating the MSE Geogrid.  These walls are shown as up to 20
   feet and extend to frost depth supported on soil behind town additional
   Mechanically Stabilized Earth (MSE) walls to the north constructed using more
   conventional means, with proprietary precast masonry units ('Allan Block').

485.     SGA breached its duty to Plaintiffs by designing a building with shifting

---

[10] https://www.aia.org/articles/198831-you-and-your-architect
[11] Exhibit I, p. 2.
[12] Exhibit H, p. 8

concrete design. For example,

> Because the aforementioned cracking and shifting of concrete slab reduces the safety, structural stability, and the intended use of the structure below accepted standards (Building Code), and requires repairs, this condition is a "structural defect" and a violation of DC Condominium Act.[13]

486.    SGA breached its duty to Plaintiffs in designing a non-compliant building foundation. For example,

> Because the aforementioned foundation issues reduce the safety, structural stability, and the intended use of the structure below accepted standards (Building Code), and requires repairs, this condition is a "structural defect" and a violation of the DC Condominium Act.[14]

487.    SGA owed Plaintiffs a duty of reasonable care when performing its work on Talbert Street, particularly as it relates to the health and safety of Plaintiffs, which duty is controlled by codes and regulations enacted to ensure the maintenance of safety standards on construction of Talbert Street.

488.    SGA breached its duty of care by, without limitation, providing faulty plans, drawings, and specifications for Talbert Street; failing to ensure the contractors' conformance with such documents; and failing to perform its services consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances.

489.    SGA's breach of duty was the proximate cause of the damages sustained by Plaintiffs.

490.    SGA's breaches and negligent acts and omissions resulted in physical

---

[13] Exhibit C, p. 14.
[14] *Id.* at p. 33.

damage to elements of the Talbert Street Project that SGA did not perform work on or provide, such as, without limitation, insufficient concrete foundation walls and cracks in the interior drywall, which damage interfered with the work of other trades.

491.    Less than five years *after* construction, the condominium's foundation and structure is dangerously unstable, indeed the potential for continued slippage is catastrophic. As a result of health and safety concerns for the residents of the property, all residents were required to evacuate by August 30, 2021.

492.    SGA's breaches and failure to address and remediate the alleged problems with the Property, including, but not limited to, the Third Wall have caused Plaintiffs to suffer damages.

## COUNT XV
## (BREACH OF CONTRACT AGAINST SGA)

493.    Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and further allege as follows:

494.    As described above, Stanton and/or Rivereast entered into a valid enforceable contract (the SGA Contract) with SGA to provide architectural design services for the Property and SGA is the architect of record under the POS.

495.    SGA's duties under the SGA Contract included preparation and provision of a site plan, drawings, plans, and specifications and ensuring that contractors' submittals conformed with the information given and design concept expressed in the Contract Documents. SGA Contract, § 3.1, § 3.2.5, § 3.3.1, § 3.4.1, and§ 3.6.4.2.

496.    Under the terms of the SGA Contract, SGA was to "perform its services consistent with the professional skill and care ordinarily provided by architects

practicing in the same or similar locality under the same or similar circumstances."

SGA Contract, § 2.2.

497.     Under the terms of the contract, "the Architect shall be responsible for the

Architect's negligent acts or omissions." SGA Contract, § 3.6.1.2.

498.     SGA breached its duties under the SGA Contract by, without limitation,

providing faulty site plans, drawings, plans, and or specifications for the Property,

failing to ensure that contractors' submittals conformed with the Property designs,

and failing to perform its services on the Property in accordance with the established

standard of care.

499.     As outlined in detail above, public documents recorded in the DC Recorders Office,

and upon information and belief, the contracts between SGA and Defendants, made it clear that

SGA was providing its services for a 46-unit condominium project reserved for Eligible

Purchasers only under the HPTF program.

500.     Plaintiffs, as Eligible Purchasers of each of their units from the limited 46-units

exclusively dedicated to HPTF participants, were ascertainable as intended beneficiaries to

SGA's design and construction of the 46-unit condominium property.

501.     The specific 46 Eligible Purchasers under the District of Columbia's HPTF

Program (i.e., including the Plaintiffs) were limited, specific, identifiable, ascertainable,

and intended beneficiaries of the design and construction of a 46-unit condominium

property.

502.     Plaintiffs as intended occupants and owners of these units in a 46-unit

condominium Property were or should have been expected to benefit from safely

designed and constructed housing by SGA and other Defendants.

503.     Plaintiffs are third-party beneficiaries to the contract between SGA and

other Defendants.

## COUNT XVI
## (NEGLIGENCE AGAINST MADDOX)

504.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and

further allege as follows:

505.     Maddox was the engineer and surveyor for the Property.

506.     According to D.C. Code § 47.2853.131 Scope of Practice for Engineers, the

"practice of engineering" means:

> the application of special knowledge of the mathematical, physical and
> engineering sciences and the methods of engineering analysis and design
> in the performance of services and creative work including consultation,
> investigation, expert technical testimony, evaluation, planning, design and
> design coordination of engineering works and systems, planning the use of
> land and water, performing engineering surveys and studies, and the
> review of construction for the purpose of monitoring compliance with
> drawings and specifications, in connection with any utilities, structures,
> buildings, machines, equipment, processes, work systems, projects, and
> industrial or consumer products, or equipment of a control systems,
> communications, mechanical, electrical, hydraulic, pneumatic, or thermal
> nature, that may involve safeguarding life, health, or property, and
> including such other professional services as may be necessary to the
> planning, progress, and completion of any engineering services.

507.     Maddox owed Plaintiffs a duty of reasonable care when performing its work

on the Talbert Street Project, particularly as it relates to the health and safety of Plaintiffs,

which duty is controlled by codes and regulations enacted to ensure the maintenance of

safety standards on construction Talbert Street.

508.     Maddox breached its duties by, without limitation, misapprehending the

Talbert Street Project design documents and providing faulty surveying data that led to

the structural problems encountered on the Talbert Street Project and interference with the work performed by other trades.

509.     Maddox's breach of duty was the proximate cause of the damages sustained by Plaintiffs.

510.     Maddox's breaches and failure to address and remediate its negligent acts and omissions resulted in physical damage to elements of the Talbert Street Project that Maddox did not perform work on or provide, such as, without limitation, insufficient concrete foundation walls and cracks in the interior drywall.

511.     Maddox was the contractor responsible for engineering services at the Property. Exhibit B.

512.     The condominium is sliding off the hill upon which it was constructed. Maddox as the engineer and "surveyor" breached its duty to Plaintiffs by failing to provide proper site grading on the Property. For example,

> The Building Code requires that grading of the ground adjacent to the foundation be sloped away, or an alternate method be employed, to divert water away from the foundation (see Code excerpt as follows).

**1803.3 Site grading.** The ground immediately adjacent to the foundation shall be sloped away from the building at a slope of not less than one unit vertical in 20 units horizontal (5-percent slope) for a minimum distance of 10 feet (3048 mm) measured perpendicular to the face of the wall. If physical obstructions or lot lines prohibit 10 feet (3048 mm) of horizontal distance, a 5-percent slope shall be provided to an approved alternative method of diverting water away from the foundation. Swales used for this purpose shall be sloped a minimum of 2 percent where located within 10 feet (3048 mm) of the building foundation. Impervious surfaces within 10 feet (3048 mm) of the building foundation shall be sloped a minimum of 2 percent away from the building.
Excerpt from International Building Code 2006

> To the extent that improper drainage reduces the safety and intended use of the structure, the area qualifies as a 'structural defect' requiring repair in accordance with the Condominium Act of the District of Columbia.

> During our observations we noted several areas along the rear of the
> building where there appeared to be pooling sewage around the clean-outs.
> We also have been notified of sewage back-ups at several lower level
> basement sections of the dwelling.[15]

513.     Less than five years *after* construction, the condominium's foundation and structure is

dangerously unstable. As a result of health and safety concerns for the residents of the property,

all residents were required to evacuate by August 30, 2021.

514.     Maddox's breaches and failure to address and remediate the problems on the

Talbert Street Project Property have caused Plaintiffs to suffer damages.

## COUNT XVII
## (BREACH OF CONTRACT AGAINST MADDOX)

515.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and

further allege as follows:

516.     As described above, Maddox was hired by Stanton and/or Rivereast to provide

surveying and engineering services for the Property and is the surveying engineer of

record under the POS.

517.     Maddox's duties on the Property included, without limitation, assessment and

analysis of the Property site and preparation of construction grade sheets for the Third

Wall, among other things.

518.     Maddox breached its duties by providing inaccurate and faulty surveying data

that led to the structural problems encountered on the Property and interfered with the

work of other trades.

519.     As outlined in detail above, public documents recorded in the DC Recorders

Office, and upon information and belief, the contracts between Maddox and Defendants,

---

[15] Exhibit C, p. 48.

made it clear that Maddox was providing its services for a 46-unit condominium project reserved for Eligible Purchasers only under the HPTF program.

520.     Plaintiffs, as Eligible Purchasers of each of their units from the limited 46-units exclusively dedicated to HPTF participants, were ascertainable as intended beneficiaries to Maddox's surveying engineer services related to the design and construction of the 46-unit condominium property.

521.     The specific 46 Eligible Purchasers under the District of Columbia's HPTF Program (i.e., including the Plaintiffs) were limited, specific, identifiable, ascertainable, and intended beneficiaries of the design and construction of a 46-unit condominium property.

522.     Plaintiffs as intended occupants and owners of these units in a 46-unit condominium Property were or should have been expected to benefit from safely designed and constructed housing by Maddox and other Defendants.

523.     Plaintiffs are third-party beneficiaries to the contract between Maddox and other Defendants.

## COUNT XVIII
## (NEGLIGENCE AGAINST SKARDA)

524.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and further allege as follows:

525.     Skarda was the structural engineer for the construction of Talbert Street.

526.     According to Skarda's website, a structural engineer is "a person trained to apply sound scientific principles in the design and investigation of buildings, tunnels,

bridges, decks, footings, swimming pools, retaining walls, foundation, underpinning, towers and other structures."[16]

527.     According to D.C. Code § 47.2853.131 Scope of Practice for Engineers, the "practice of engineering" means:

> the application of special knowledge of the mathematical, physical and engineering sciences and the methods of engineering analysis and design in the performance of services and creative work including consultation, investigation, expert technical testimony, evaluation, planning, design and design coordination of engineering works and systems, planning the use of land and water, performing engineering surveys and studies, and the review of construction for the purpose of monitoring compliance with drawings and specifications, in connection with any utilities, structures, buildings, machines, equipment, processes, work systems, projects, and industrial or consumer products, or equipment of a control systems, communications, mechanical, electrical, hydraulic, pneumatic, or thermal nature, that may involve safeguarding life, health, or property, and including such other professional services as may be necessary to the planning, progress, and completion of any engineering services.

528.     Talbert Street's retaining wall, foundation, underpinnings, buildings and structures have failed, such that continued slippage may be catastrophic.

529.     Skarda owed Plaintiffs a duty of reasonable care when performing its work on the Talbert Street Project, particularly as it relates to the health and safety of the Plaintiffs, which duty is controlled by codes and regulations enacted to ensure the maintenance of safety standards on construction Talbert Street.

530.     Skarda breached its duties by, without limitation, misapprehending the Talbert Street Project design documents and providing faulty drawings that led to structural problems encountered on the Talbert Street Project and interfered with the work of other trades.

---

[16] http://www.skardaengineers.com/

531.     Skarda's breach of duty was the proximate cause of the damages sustained by Plaintiffs.

532.     Skarda's breaches and failure to address and remediate its negligent acts and omissions resulted in physical damage to elements of the Talbert Street Project that Skarda did not perform work on or provide, such as, without limitation, insufficient concrete foundation walls and cracks in the interior drywall.

533.     For example, Skarka breached its duty in the design of the toe and heal drain:

   a.  Skarda & Associates Inc. Drawing S3.03 indicates toe and heal drain at the MSE wall. . . The outlet discharge pipes for toe and heel drains are shown as separate, set near the bottom of the wall, with discharge onto the ground surface and directed away from the toe of the wall onto concrete splash aprons. . . Neither the toe nor heel drainage stone indicated on the design drawings includes a separation geotextile to prevent soil from entering the stone.[17]

   b.  We verified by test pits that the exposed footing surface on the outside was 30 inches wide from face of building wall, in accordance with the construction documents; however, the top of footing was buried just 6 to 8 inches at 2 separate locations.  The bottom of footing is projected to be just 18 to 20 inches deep and not in compliance with minimum frost depth.[18]

534.     Skarda's breaches and failure to address and remediate the problems on the Talbert Street Project have caused Plaintiffs to suffer damages.

## COUNT XIX
## (BREACH OF CONTRACT AGAINST SKARDA)

535.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and further allege as follows:

536.     As described above, Skarda was hired to provide engineering services for the Property.

---

[17] Exhibit F, pp. 7-8.
[18] Exhibit E, p. 9.

537.     Skarda provided structural plans related to the Property.[19]

538.     Skarda's duties for the Property included, but were not limited to, assessment and analysis of the Property site and preparation of construction drawings for the Third Wall, among other things.

539.     Skarda breached its duties by providing inaccurate and faulty drawings and other data that led to the structural problems encountered on the Property and interfered with the work of other trades.

540.     As outlined in detail above, public documents recorded in the DC Recorders Office, and upon information and belief, the contracts between Skarda and Defendants, made it clear that Skarda was providing its services for a 46-unit condominium project reserved for Eligible Purchasers only under the HPTF program.

541.     Plaintiffs, as Eligible Purchasers of each of their units from the limited 46-units exclusively dedicated to HPTF participants, were ascertainable as intended beneficiaries to Skarda's engineer services related to the design and construction of the 46-unit condominium property.

542.     The specific 46 Eligible Purchasers under the District of Columbia's HPTF Program (i.e., including the Plaintiffs) were limited, specific, identifiable, ascertainable, and intended beneficiaries of the design and construction of a 46-unit condominium property.  Plaintiffs as intended occupants and owners of these units in a 46-unit condominium Property were or should have been expected to benefit from safely designed and constructed housing by Skarda and other Defendants.

---

[19] Exhibit C.

543.     Plaintiffs are third-party beneficiaries to the contract between Skarda and other

Defendants.

## COUNT XX
## (NEGLIGENCE AGAINST CDDI)

544.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and

further allege as follows:

545.     CDDI specializes in civil engineering, land surveying and geotechnical

engineering, among other things.[20]

546.     CDDI owed Plaintiffs a duty of reasonable care when performing its work on

the Talbert Street Project, particularly as it relates to the health and safety of the

Plaintiffs, which duty is controlled by codes and regulations enacted to ensure the

maintenance of safety standards on construction Talbert Street.

547.     CDDI breached this duty by, without limitation, providing less than competent

supervision, testing, and analysis and in doing so, endangering the structural foundation

of the residences on Talbert Street.

548.     CDDI's breach of duty was the proximate cause of the damages sustained by

Plaintiffs.

549.     CDDI's breaches and failure to address and remediate its negligent acts and

omissions resulted in physical damage to elements of the Talbert Street Project that

CDDI did not provide or perform work on or provide, such as, without limitation,

insufficient concrete foundation walls and cracks in the interior drywall.

550.     CDDI' s breaches and failure to address or remediate the alleged problems with

the Third Wall, among other things, have caused Plaintiffs to suffer damages.

---

[20] https://cddi.net/

**COUNT XXI**
**(BREACH OF CONTRACT AGAINST CDDI)**

551.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and further allege as follows:

552.     As described above, CDDI was hired to provide engineering services for the Property.

553.     CDDI owed Plaintiffs, at a minimum, a duty of reasonable care when performing its work on the Property, particularly as it relates to the health and safety of the unit owners of the condominium buildings, which duty is controlled by codes and regulations enacted to ensure the maintenance of safety standards on construction projects.

554.     CDDI breached this duty by, without limitation, providing less than competent supervision, testing, and analysis and in doing so, endangering the structural foundation of the residences on the Property.

555.     CDDI's breach of duty was the proximate cause of the damages sustained by Plaintiffs.

556.      CDDI's breaches and failure to address and remediate its negligent acts and omissions resulted in physical damage to elements of the Property that CDDI did not provide or perform work on or provide, such as, without limitation, insufficient concrete foundation walls and cracks in the interior drywall.

557.     As outlined in detail above, public documents recorded in the DC Recorders Office, and upon information and belief, the contracts between CDDI and Defendants, made it clear that CDDI was providing its services for a 46-unit condominium project reserved for Eligible Purchasers only under the HPTF program.

558.     Plaintiffs, as Eligible Purchasers of each of their units from the limited 46-units exclusively dedicated to HPTF participants, were ascertainable as intended beneficiaries to CDDI's engineer services related to the design and construction of the 46-unit condominium property.

559.     The specific 46 Eligible Purchasers under the District of Columbia's HPTF Program (i.e., including the Plaintiffs) were limited, specific, identifiable, ascertainable, and intended beneficiaries of the design and construction of a 46-unit condominium property.  Plaintiffs as intended occupants and owners of these units in a 46-unit condominium Property were or should have been expected to benefit from safely designed and constructed housing by CDDI and other Defendants.

560.     Plaintiffs are third-party beneficiaries to the contract between CDDI and other Defendants.

## COUNT XXII
## (NEGLIGENCE AGAINST FES)

561.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and further allege as follows:

562.     FES promotes itself as experts in engineering, environmental and due diligence services including geotechnical exploration services, phase I and II environmental site assessments, property condition assessments/physical needs surveys; civil engineering design and site layout, and construction materials testing.[21]

563.     FES owed Plaintiffs a duty of reasonable care when performing its work on the Talbert Street Project, particularly as it relates to the health and safety of the Plaintiffs,

---

[21] http://www.fesgroupllc.net/

which duty is controlled by codes and regulations enacted to ensure the maintenance of safety standards on construction Talbert Street.

564.     FES breached this duty by, without limitation, performing less than competent work in constructing the Third Wall, among other things, on the Talbert Street Project and, in doing so, endangering the structural foundation of the residences on the Property.

565.     FES's breach of duty was the proximate cause of the damages sustained by the Plaintiffs.

566.     FES's breaches and failure to address and remediate its negligent acts and omissions resulted in physical damage to elements of the Talbert Street Project that FES did not perform work on or provide, such as, without limitation, insufficient concrete foundation walls and cracks in the interior drywall.

567.     FES's breaches and failure to address or remediate the alleged problems with the Third Wall, among other things, have caused Plaintiffs to suffer damages.

## COUNT XXIII
## (BREACH OF CONTRACT AGAINST FES )

568.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and further allege as follows:

569.     As described above, Stanton and/or Rivereast entered into a valid enforceable contract (the FES Contract) with FES for the provision of services for the Property.

570.     Under the terms of the FES Contract, FES agreed to perform work on the Property "in a good and workmanlike manner," "in accordance with plans, specification, drawings, and schedule for the Work," and "in strict accordance with all applicable federal, state, county and local codes and regulations, OSHA and State safety regulations, and this Agreement." FES Contract, Secs. l(a-b); *see also* Sec. 12.

571.     FES agreed that "[a]ll Work is to be representative of the best of the trade" and that "failure to notify Builder of problem areas prior to commencement of Work indicates acceptance and responsibility for the installation." FES Contract, Sec. l(b)(VI); Sec. l(b)(XIV).

572.     FES was to be responsible for "inspecting each Site," reading "all Contract Documents and all construction plans, specification, drawings and schedules," and "comparing the Site with the plans and specifications." FES Contract, Sec. 9.

573.     FES was also "responsible for confirming that the specifications for the Work are correct." FES Contract, Sec. 10.

574.     Under the terms of the FES Contract, FES agreed to indemnify Stanton as follows:

> Contractor hereby agrees to defend, indemnify, and save harmless Builder and its officers, directors, shareholders and employees against any and all loss, damages, liability, claims, demands or costs resulting from injury or harm to persons or property (including, without limitation, Contractor's employees or property) arising out of or in any way connected with Contractor's performance hereof (excepting only such injury or harm as may have been caused solely by the fault or negligence of Builder or its employees), or resulting or arising from any lien, claim or proceeding by or relating to Contractor or any of its subcontractors, suppliers or any person or organization directly employed by any of them to perform or furnish any of the Work...[].

> FES Contract, Sec. 21; *see also* Sec. 17.

575.     FES further agreed that:

> Contractor hereby agrees to indemnify, defend and hold the Builder and its Subsidiaries and/or Affiliate(s) harmless from any and all claims, demands, lawsuits, costs, judgments, losses and liabilities, including reasonable attorney's fees incurred by the Builder and/or its Affiliate, that in any way relate or pertain to breach of this Agreement or negligence in performance of the work and duties required in this section of the Agreement or by law whether or not it is contended that that Builder and/or Affiliate contributed thereto in whole or in part...[].

FES Contract, Sec. 13 (emphasis in original).

576.    FES breached these duties by, without limitation, failing to perform its work in a good and workmanlike manner; failing to perform in accordance with the contract documents; failing to compare the work performed with the plans, drawings, and specifications; negligently constructing the Third Wall, among other things; and failing to indemnify Stanton.

577.    As outlined in detail above, public documents recorded in the DC Recorders Office, and upon information and belief, the contracts between FES and Defendants, made it clear that FES was providing its services for a 46-unit condominium project reserved for Eligible Purchasers only under the HPTF program.

578.    Plaintiffs, as Eligible Purchasers of each of their units from the limited 46-units exclusively dedicated to HPTF participants, were ascertainable as intended beneficiaries to FES's engineering services related to the design and construction of the 46-unit condominium property.

579.    The specific 46 Eligible Purchasers under the District of Columbia's HPTF Program (i.e., including the Plaintiffs) were limited, specific, identifiable, ascertainable, and intended beneficiaries of the design and construction of a 46-unit condominium property.

580.    Plaintiffs as intended occupants and owners of these units in a 46-unit condominium Property were or should have been expected to benefit from safely designed and constructed housing by FES and other Defendants.

581.    Plaintiffs are third-party beneficiaries to the contract between FES and other Defendants.

## COUNT XXIV
## (NEGLIGENCE AGAINST M&F)

582.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein and further allege as follows:

583.     M&F owed Plaintiffs a duty of reasonable care when performing its work on the Talbert Street Project, particularly as it relates to the health and safety of the Plaintiffs, which duty is controlled by codes and regulations enacted to ensure the maintenance of safety standards on construction Talbert Street.

584.     M&F breached this duty by, without limitation, providing less than competent supervision, labor, and materials for the concrete work on the Talbert Street Project and endangering the structural foundation of the residences on Talbert Street.

585.     M&F's breach of duty was the proximate cause of the damages sustained by the Plaintiffs.

586.     M&F's breaches and failure to address and remediate its negligent acts and omissions resulted in physical damage to elements of the Talbert Street Project that M&F did not perform work on or provide, such as, without limitation, cracks in the interior drywall.

587.     M&F breached its duties to Plaintiffs by failing to provide proper concrete. Cracking in concrete flatwork is a material failure that occurs when the concrete is subjected to mechanical stresses that exceed the material's strength and results in a rupture of the slab.  Cracks can result from stresses generated internally, for example,

during curing and shrinkage when properly located and detailed

control/expansion/isolation joints are not installed. [22]

588.     M&F's breaches and failure to address or remediate the alleged problems with

the Third Wall, among other things, have caused Plaintiffs to suffer damages.

## COUNT XXV
## (BREACH OF CONTRACT AGAINST M&F)

589.     Plaintiffs incorporate all of the facts in the Complaint as if fully set forth herein

and further allege as follows:

590.     As described above, M&F entered into a valid enforceable contract (the M&F

Contract) with Stanton and/or Rivereast to provide labor and materials for, and to

perform, concrete work on the Property.

591.     Under the terms of the M&F Contract, M&F was to perform all work on the

Property "under the direction, and to the satisfaction, of Builder [Stanton] in accordance

with plans, specification, drawings, and schedules for the Work, and any supplemental

terms and conditions to this Agreement." M&F Contract, Sec. l(A).

523.     All work on the Property was to be "representative of the best of the Trade

and shall include, but not be limited to, the signed Bid Sheets, Scopes of Work and

Contract Documents. Failure to notify Builder of problem areas prior to

commencement of Work indicates acceptance and responsibility for the installation."

M&F Contract, Sec. l(B)(VI).

524.     Under the terms of the M&F Contract, M&F was to indemnify Stanton as follows:

> Contractor hereby agrees to defend, indemnify and save harmless
> Builder and its officers, directors, shareholders, and employees against
> any and all loss, damage, liability, claims, demands or costs resulting

---

[22] Transition Engineering Evaluation For River East at Grandview Condominium Association, Washington, DC.
Prepared by The Falcon Group Engineers, Architects and Reserve Specialist.  January 20, 2021.  Page 40.

> from injury or harm to persons or property (including, without limitation, Contractor's employees or property) arising out of or in any way connected with Contractor's performance hereof, (excepting only such injury or harm as may have been caused solely by the fault or negligence of Builder or its employees), or resulting or arising from any lien, claim or proceeding by or relating to Contractor or any of its subcontractors, suppliers or any person or organization directly employed by any of them to perform or furnish any of the work ................................................................. [ ].

M&F Contract, Sec. 21.

525.    M&F breached the M&F Contract by, without limitation, failing to perform competent work on the Property in accordance with the standards identified above.

526.    M&F was notified of the problems regarding its work and has refused to accept responsibility or to assist in a remediation of the same.

527.    M&F breached the M&F Contract by failing to indemnify Stanton pursuant to the terms of Section 21.

592.    As outlined in detail above, public documents recorded in the DC Recorders Office, and upon information and belief, the contracts between M&F and Defendants, made it clear that M&F was providing its services for a 46-unit condominium project reserved for Eligible Purchasers only under the HPTF program.

593.    Plaintiffs, as Eligible Purchasers of each of their units from the limited 46-units exclusively dedicated to HPTF participants, were ascertainable as intended beneficiaries to M&F's services related to the design and construction of the 46-unit condominium property.

594.    The specific 46 Eligible Purchasers under the District of Columbia's HPTF Program (i.e., including the Plaintiffs) were limited, specific, identifiable, ascertainable, and intended beneficiaries of the design and construction of a 46-unit condominium property.

595.     Plaintiffs as intended occupants and owners of these units in a 46-unit condominium Property were or should have been expected to benefit from safely designed and constructed housing by M&F and other Defendants.

528.     Plaintiffs are third-party beneficiaries to the contract between M&F and other Defendants.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court provide the following relief:

1.     Judgment in favor of each Plaintiff against each applicable Defendant;

2.     Award judgment against each applicable Defendant for all available remedies under each of the above causes of action including, but not limited to, where applicable, treble damages, punitive damages, compensatory damages, out-of-pocket expenses, emotional distress, and preliminary and permanent injunctive relief sufficient to permanently and completely correct and finance all structural and unit defects within a reasonable period of time;

3.     Require all Defendants to make Plaintiffs whole by requiring Defendants to purchase all of the condominiums from each Plaintiff at purchase or market value, whichever is greater, including all costs associated with temporary housing and relocation; and full release of all covenants and obligations for repayment under the HPAP program and opportunity to participate in the HPAP program as a prioritized first-time homebuyer and including monetary compensation and allowance for re-participation in the District's first-time homebuyer program without penalty or exception;

4.      Release and void all fines, interest, and fees associated related to the causes of action in this Complaint, including, but not limited to, DCRA and/or REGCUOA fines and fees;

5.      Award civil penalties under applicable statute;

6.      Reasonable attorneys' fees and costs; and

7.      Award any other relief the Court deems just and proper.

Respectfully submitted,
MAY JUNG LLP


/s/Je Yon Jung
Je Yon Jung #495154
LaRuby May #983484
3216 11TH Place SE
Washington, D.C. 20032
Tel: (202) 423-4137
Fax: (202) 618-8282
jeyon@mayjung.com
laruby@mayjung.com
Counsel for Plaintiffs




**JURY TRIAL DEMAND**


Plaintiffs request a jury trial on all counts.



 /s/Je Yon Jung
Je Yon Jung

## CERTIFICATE OF SERVICE

I, LaRuby May, certify that on April 7, 2023, a copy of the foregoing Second

Amended Complaint was served via the Court's electronic filing system and emailed to

all counsel of record .

/s/ LaRuby May

Corcoran, Stephanie    stephanie.corcoran@dc.gov
Steinhilber, August    asteinhilber@thebraultfirm.com
Ferguson, Robert       rferguson@fsb-law.com
Shoemaker, Jonathan    jcs@leeshoemaker.com
Oxendine, Patricia     patricia.oxendine@dc.gov
Dygert, Timothy        tdygert@fsb-law.com
Thompson, Gary         gthompson@thompsonhd.com
Taggi, Christopher     ctaggi@asm-law.com
Samuel, Jordan         jsamuel@asm-law.com

SGA COMPANIES, INC.,
SGA Companies, Inc.
7508 Wisconsin Avenue, 4th Floor
Bethesda, Maryland 20814

MADDOX ENGINEERS AND SURVEYORS, INC.,
LSBA, Inc.
c/o Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD 21202

SKARDA AND ASSOCIATES, INC.,
Registered Agent Solutions, Inc.
1100 H Street, NW, Suite 840
Washington, D.C. 20005

CAPITOL DEVELOPMENT DESIGN, INC.
James Watkins, Registered Agent
1002 Shepherd St., NE
Washington, D.C. 20017

FES GROUP, LLC,
Corporation Service Company
1090 Vermont Ave., NW
Washington, D.C. 20005

M&F CONCRETE, INC.,
Marcos Silva, Registered Agent
12082 Serenity Pl.
Nokesville, VA 20181

LaRuby May